In the Matter of Salvador VECCHIONE, Bankrupt.

Albert SACKLOW, Trustee in Bankruptcy, and Joseph Fleres, Objecting Creditor, Appellants,

v.

Salvador VECCHIONE, Bankrupt-Appellee.

In the Matter of Salvador VECCHIONE, Jr., Bankrupt.

Albert SACKLOW, Trustee in Bankruptcy, and Joseph Fleres, Objecting Creditor, Appellants,

v.

Salvador VECCHIONE, Jr., Bankrupt-Appellee.

Nos. 72 B 553, 72 B 554.

United States District Court, E. D. New York.

Jan. 27, 1976.

Fried, Greenbaum & Scher, New York City, for appellants Sacklow and Fleres; by Harvey Fried, New York City.

Otterbourg, Steindler, Houston & Rosen, P. C., New York City, for appellees Salvador Vecchione and Salvador Vecchione, Jr.; by Conrad B. Duberstein, and M. David Graubard, New York City.

## OPINION

NEAHER, District Judge.

These are two appeals from decisions of the bankruptcy judge dismissing specifications of objection aginst Salvador Vecchione ("Vecchione, Sr.") and Salvador Vecchione, Jr. ("Vecchione, Jr.") and granting each of them a discharge in bankruptcy. By agreement of the parties, the specifications of objection against both bankrupts were tried in one non-continuous seven-day hearing before the bankruptcy judge.

Thirty-six specifications were filed against Vecchione, Sr. and 41 specifications were filed against Vecchione, Jr. Many of the specifications call into question a series of asset transfers from the bankrupts to their wives, including transfers of interests in personal dwellings, cars and money. The specifications also allege a failure to list monies allegedly owed to the bankrupts.

The bankruptcy judge concluded that appellants had failed to sustain their burden of proof on all specifications of objection as to both bankrupts and granted the discharges. On this appeal, appellants raise three principal claims of error. First, they contend that the bankruptcy judge improvidently exercised his discretion in placing the burden of proof upon them. Second, they argue that the bankruptcy judge erred in not considering all of the asset transfers and the parallel course of conduct of both

bankrupts in deciding the crucial questions of the bankrupts' intention to secrete assets and defraud creditors. Third, they assert that the bankruptcy judge erred as a matter of law by finding that a contract which provided for the bankrupts to receive various sums of money was subject to a condition precedent which never materialized and thus did not obligate the bankrupts to list as assets monies to be received thereunder.

For the reasons stated below the decision of the bankruptcy judge is affirmed in part and reversed in part.

## I. *Facts*

Vecchione, Sr. had been the president of Salro Manufacturing Corporation ("Salro") from its inception in 1953 until September 1972, when he resigned. In 1964, Salro acquired certain equipment from CIT Leasing Corporation ("CIT") under a lease-purchase arrangement, which obligated Salro to make yearly payments of approximately $14,000 until June 30, 1971. Vecchione, Sr. guaranteed Salro's performance under that agreement. In July 1969, Salro defaulted on this obligation. At the time of default, Salro owed CIT a balance of about $42,000, which was more than adequately secured by the machinery itself.[1]

Also in 1964, Vecchione, Sr. guaranteed Salro's debt to A.I.C. Financial, Inc. ("AIC"). This loan, which approximated $65,000 as of August 1969, was also secured by Salro's equipment. Vecchione, Sr. had to deposit $15,000 as collateral with AIC as a condition for receiving the financing.

In June 1965, Vecchione guaranteed Salro's obligations to one of its suppliers, Harshaw Chemical Company ("Harshaw"). Salro defaulted on this obligation and Harshaw recovered a judgment against Vecchione, Sr. in September 1971 in the Nassau County District Court.

In 1964, Vecchione, Sr. and the objecting creditor, Joseph Fleres, were the major stockholders and operating principals of Salro. On May 29, 1968, Vecchione, Sr. agreed to purchase Fleres' interest in Salro (83,392 shares) for $100,000, paying $29,000 down and the balance of $71,000 in 60 monthly installments (approximately $1,200 each) plus 6% annual interest on the unpaid balance. Under the agreement, Vecchione, Sr. received 20,000 Salro shares upon payment of the $29,000 and the balance of Fleres' shares (63,392) were placed in escrow as security for the notes. The agreement further provided for the return to Fleres of the 63,392 shares should Vecchione, Sr. default on the notes.

Vecchione, Jr. became involved in Salro in 1968, first as comptroller and later as treasurer. In 1969, he guaranteed Salro's obligations to AIC and also deposited $15,000 as collateral with AIC.

In August 1969, Salro filed a petition under Chapter XI of the Bankruptcy Act. This action was precipitated by AIC's refusal to continue financing Salro's operation. At that time, Salro had also incurred a liability for withholding taxes to the federal government.

In August or September 1969, Vecchione, Sr. defaulted on his commitment to Fleres and the 63,392 shares were returned to the latter.

A plan to revitalize Salro was worked out between Vecchione, Sr., Vecchione, Jr., Fleres and two companies, of which Abraham Zion was a principal, Rotomotive, Inc. ("Rotomotive") and Rotodyne, Inc. ("Rotodyne"). By agreement dated September 19, 1969, Rotomotive purchased all Salro stock owned by Vecchione, Sr. (103,392 shares), and Jr. (13,379 shares), for an unspecified consideration. In March 1970, Rotomotive agreed to purchase the 63,392 shares retaken by Fleres for a specified consideration and Vecchione, Jr. agreed to guarantee Vecchione, Sr.'s debt to Fleres. Both Vecchiones agreed to waive any rights they had to the return of their $15,000 deposits with AIC. Salro's Chapter XI plan was confirmed in March 1970.

---

1. The machinery was sold in 1970 or 1971 for in excess of $100,000.

Vecchione, Sr. again defaulted on his obligation to Fleres in September 1970.

Both bankrupts filed their petitions on May 30, 1972, apparently as a result of being pressed by Fleres.

The nature and extent of the asset transfers underlying many of the specifications of objection and other salient facts are essentially undisputed and will be briefly related below.

### Vecchione, Sr.

On April 1, 1965, Vecchione, Sr. conveyed his interest by the entirety in his one-family residence in Malverne, New York, to his wife, Mary, for $6,000. At the time of the transfer there was an equity of $15,000 to $20,000 in the property. In 1970, he transferred his 1965 Cadillac automobile to his wife in partial repayment of money he owed her and because she was paying the automobile bills. On July 1, 1970, he turned over to her a $8,075 check he had received from the Salro Pension Fund. Between October 1, 1969 and May 30, 1972, he gave her a total of $15,723.45 and between June 30, 1970 and May 30, 1972 he gave her a total of $14,552.34. These figures are the totals of regular deposits made by Mary Vecchione in various bank accounts during those periods.

There is no doubt that during the periods here in issue Mary Vecchione was not gainfully employed and any deposits she made were of funds earned by her husband. Both Vecchione, Sr. and his wife testified that during their entire 39 years of marriage, Vecchione, Sr., has followed a practice of turning over to his wife his entire earnings (less an amount he retains for personal expenses), out of which she pays all household expenses and keeps for herself any surplus. It was this surplus which constituted the regular bank deposits made by her.

Periodically, Vecchione, Sr. borrowed money from his wife for use in his business. These loans, which aggregated tens of thousands of dollars, also came from this surplus. No records of these loans or repayments were kept, but Vecchione, Sr. testified that he believes he still owes his wife from ten to fifteen thousand dollars. His wife was not listed as a creditor in this proceeding.

Until 1965, Mary Vecchione deposited funds given her by her husband in bank accounts bearing both their names as joint tenants. That year she began closing the joint accounts and opening new Totten trust accounts bearing the label Mary Vecchione in trust for Salvador Vecchione. This process was completed sometime in 1968.

### Vecchione, Jr.

On October 20, 1969, Vecchione, Jr. conveyed his interest in his personal dwelling in Malverne, New York, to his wife, Isabel, for $5,000. The house was originally purchased in 1963 or 1964. At the time of the sale, there was an equity of $12,000 or $13,000 in the property.

Sometime during 1969 or 1970, he transferred his 1969 Chrysler station wagon to Isabel in consideration for her agreeing to meet the then outstanding installment obligations of $1,400. The car had cost $5,200 when purchased new in 1968. Isabel's 1963 automobile was used as a trade-in on that purchase.

On February 5, 1971, he transferred shares of the Axe Science Corporation, a publicly-held mutual fund, to Isabel. On July 1, 1970, he gave her $1,605 received by him from the Salro Pension Fund. Between October 1, 1969 and May 30, 1972 he gave her a total of $15,446.51 and between May 4, 1972 and May 30, 1972 he gave her $3,533.56. Additionally, on July 7, 1971, he gave his wife $1,000 and his mother $3,000.

In June 1968, Isabel withdrew the balance of $215 from a joint account at the Dollar Federal Savings & Loan Association and with that money opened a new savings account at that same branch in the name of Isabel Vecchione in trust for Salvador J. Vecchione.

As with Vecchione, Sr. and Mary, there is no claim here that funds deposited by Isabel were earned by her. Rather, deposits made by her are attributable to the excess of Vecchione, Jr.'s earnings

over household expenses and an amount he retained for personal use.

The thrust of appellant's many specifications of objection is that as soon as each of the bankrupts became financially obligated, he began a systematic plan to nominally divest himself of assets through sham intra-family transfers.

In dismissing the specifications of objection relating to these transfers the bankruptcy judge made, *inter alia*, the following findings and conclusions. As to Vecchione, Sr., the judge found that during 39 years of marriage he had

> "turned over to his wife all of his salaries and other moneys . . . less small sums he personally required, which she was to use for household expenses and any balance remaining was to be her[s] . . . ."

He further found that she made all deposits and withdrawals from the various bank accounts and that in fact Vecchione, Sr. "had no knowledge of their existence until she testified as to them in this proceeding." He concluded, in essence, that appellants had failed to sustain their burden of proving that a secret trust exists as to any of the assets transferred and that there was no intention to defraud, hinder or delay creditors with respect to asset transfers within twelve months of bankruptcy.

The judge made the same findings and conclusions with respect to Vecchione, Jr., along with the additional finding that the shares of Axe Science Fund he transferred to his wife were purchased by his mother for her grandchildren and given him merely as custodian and he in turn transferred them to his wife as guardian for their children.

Each of appellants' claims of error will be discussed separately below.

## II.  *Burden of Proof*

■ Prior to October 1, 1973, the burden of proof as to specifications of objection was governed by § 14c of the Act, which provided in relevant part:

> "[I]f . . . upon the hearing of an objection to a discharge, the objector shall show to the satisfaction of the court that there are reasonable grounds for believing that the bankrupt has committed any of the acts which . . . would prevent his discharge in bankruptcy, then the burden of proving that he has not committed any of such acts shall be upon the bankrupt." 11 U.S.C. § 32(c).

In effect, all the objectant had to do was establish a prima facie case and the bankrupt would then have to prove by a preponderance of the evidence that no objectionable act had been committed. *Industrial Bank of Commerce v. Bissel,* 219 F.2d 624, 626 (2 Cir. 1955).

On October 1, 1973, the new Bankruptcy Rules became effective and provided, *inter alia*,

> "At the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the facts essential to his objection." Bankruptcy Rule 407.

The April 24, 1973 order of the Supreme Court accompanying the new rules provides that they are applicable to proceedings pending on October 1, 1973,

> "except to the extent that in the opinion of the court their application in a particular proceeding then pending would not be feasible or would work injustice, in which event the former procedure applies."

The specifications of objection in these proceedings were filed on May 14, 1973 and the hearing was begun on August 29, 1973 and continued from time to time until their conclusion on March 4, 1974.

The court below in exercising its discretion not to apply the old rule, § 14c, to these proceedings, apparently was of opinion that the objectants had adequate notice of the change in the law since the order of the Supreme Court submitting the proposed new rules to Congress was made as far back as April 24, 1973, prior to the filing of the specifications of objection and prior to the commencement of the hearings.

Had the bankruptcy judge informed counsel of his decision to apply the new

rules to these proceedings prior to or even during the hearings, which extended over some six months, this court would have no trouble in affirming his decision to do so. However, during oral argument counsel for appellants informed this court that they had no inkling the new rule would be applied until the bankruptcy judge rendered his opinion on January 6, 1975. Had they known that the burden of proof was to be theirs, they claim they would have called additional witnesses who were otherwise reluctant to testify.[2]

The failure to notify counsel that the burden of proof would be placed on the objectants was, in the circumstances, a clear abuse of discretion. Knowledge that the new rule would apply to "pending" proceedings cannot reasonably be taken to mean that they would apply to a trial already in progress, which began at a time when the burden of proof rested on the other side. If such a material change was to be effected, it was the responsibility of the bankruptcy judge to advise the parties that the ground rules had been changed while they had an opportunity to adjust their trial strategy accordingly. Doing so at the time of decision was no notice at all.

The case, however, does not turn on the procedural question. In view of the conclusions the court has reached on the merits, the bankruptcy judge's failure to give timely notice of his intention is at most harmless error.

### III. *The Fraudulent Transfers*

■ As indicated earlier, the thrust of many of the specifications of objection centered on the conceded transfers of assets by the bankrupts to their wives. In order to constitute acts sufficient to bar discharge in bankruptcy, at least one of these transfers as to each bankrupt must fall within either

§ 14(c)(1) or (4). 11 U.S.C. § 32(c)(1) and (4). Section 14(c)(1) incorporates by reference the commission of "an offense punishable by imprisonment as provided under section 152 of Title 18 . . . .." Section 152, in turn, proscribes the knowing and fraudulent concealment of assets by the bankrupt from his estate. Concealment under this section has been defined as the transfer to a third party of legal title to property with the retention of a secret interest by the bankrupt. If the transfer is absolute, even if it was in fraud of creditors, it cannot form a specification of objection under § 14(c)(1). *In re Hammerstein*, 189 F. 37, 39 (2 Cir. 1911). The property must, in effect, be held in trust for the bankrupt. *In re Dauchy*, 130 F. 532 (2 Cir. 1904); *In re Baxter*, 27 F.Supp. 54 (S.D. N.Y.1939). It matters not how long before the filing of the petition the suspect transfer occurred because the act of concealment is considered a continuous one. *In re Quackenbush*, 102 F. 282 (N.D.N.Y.1900); *In re Ulrich*, 18 F.Supp. 919, 920 (S.D.N.Y.1937), aff'd, 95 F.2d 1018 (2 Cir. 1938). A concealment may be predicated on the retention by the bankrupt of an equitable interest in assets transferred to his wife. *United States v. Schireson*, 116 F.2d 881 (3 Cir. 1941); *Simon v. United States*, 123 F.2d 80 (4 Cir.), cert. denied, 314 U.S. 694, 62 S.Ct. 412, 86 L.Ed. 555 (1941).

■ Section 14(c)(4), on the other hand, reaches transfers made with intent to hinder, delay or defraud creditors *within twelve months of bankruptcy*. No secret interest need be established under this subsection but an actual fraudulent intent is required.

Therefore, asset transfers antedating twelve months of bankruptcy must be shown to involve § 14(c)(1) concealments. Here, all of the transfers, with the exception of cash transferred between May

---

**2.** The witnesses who would have been called were Abraham Zion, the original owner of Rotomotive, who was a reluctant witness, and Fleres, who was ill.

Additionally, appellants point out that the § 21(a) examinations of the bankrupts, which extended from June 1972 until January 1973, were conducted on the assumption that only a prima facie case had to be established.

30, 1971 and May 30, 1972, fall into this category.

The inquiry here concerning the concealment specifications of objection is thus two-pronged—was there a retention by the bankrupts of an equitable interest in assets transferred to their wives and, if so, was their failure to inform the trustee of these interests both knowing and fraudulent.

In dismissing the specifications of objection based on the transfers of the bankrupts' interests in their houses, the bankruptcy judge seemed to rely on the fact that deeds of transfer were filed and thus notice of the transfers was given creditors. He also found that the interests were conveyed for an adequate consideration, $6,000 in Vecchione, Sr.'s case and $5,000 in Vecchione, Jr.'s. Finally, he held that the fact that the bankrupts continued to live in the houses after the conveyances as they did before was insufficient to establish a fraudulent concealment, citing *In re Molden*, 300 F.2d 5 (7 Cir. 1962).

The bankruptcy judge also found that the transfers of the cars were supported by an adequate consideration. In Vecchione, Sr.'s case, he found the transfer to be in repayment of monies owed Mary and in consideration for her paying all of the automobile bills. In Vecchione, Jr.'s case, he found "that the bankrupt transferred the car to his wife because he could not afford to make the payments on the car."

As to the various specifications of objection based on the transfers of money to the wives, the bankruptcy judge held that "Transfers to a wife of moneys earned by a husband is not new or unusual," citing *In re Neiderheiser*, 45 F.2d 489 (8 Cir. 1930). He found that the funds remaining after payment of household expenses belonged to the wives.

From these facts the bankruptcy judge concluded that the bankrupts had not retained any secret interest in assets, houses, cars and funds, transferred to their wives; *i.e.*, that transfers absolute on their face were absolute in fact. He also found that the bankrupts had for many years followed a practice of turning over to their wives any funds coming into their possession and that consequently their intention with respect to transfers of funds occurring within twelve months of bankruptcy was not to hinder, delay or defraud their creditors.

After careful consideration of the undisputed underlying facts in these cases, the court is of opinion that appellants have sustained their burden of establishing fraudulent concealments as to both bankrupts and that the bankruptcy judge's decisions contrariwise were clearly erroneous. See *In re Hygrade Envelope Corporation*, 366 F.2d 584, 588 (2 Cir. 1966).

The analysis begins with a statement of the obvious. Persons whose intention it is to shield their assets from creditor attack while continuing to derive the equitable benefit of those assets rarely announce their purpose. Instead, if their intention is to be known, it must be gleaned from inferences drawn from a course of conduct. *In re Saphire*, 139 F.2d 34, 35 (2 Cir. 1943); *In re Freudmann*, 362 F.Supp. 429 (S.D.N.Y.1973), aff'd, 495 F.2d 816 (2 Cir. 1974).

As will be seen below, all of the major asset transfers involved here were made under suspect circumstances.

Beginning in 1964, Vecchione, Sr. undertook major financial obligations by guaranteeing Salro's debt to CIT, AIC and Harshaw. In April 1965, he transferred his interest in the house to Mary. In 1968, he incurred a substantial indebtedness to Fleres. He defaulted on that obligation in September 1969 and again in September 1970. Sometime during 1970, he transferred the car to Mary.

Throughout this period, Vecchione, Sr. turned over to Mary substantially all of the money which he received as salary, tax refunds and pension. He testified, and the bankruptcy judge found, that he has followed this practice for 39 years. Beginning in 1965, however, Mary began closing bank accounts bearing the joint caption of Salvador and/or Mary Vecchione and opening accounts titled Mary

Vecchione in trust for Salvador Vecchione. Mary testified that she thought there was no difference between the two types of account but offered no explanation as to why after some thirty years of marriage she effected this change.

Vecchione, Jr. joined Salro in 1968 and in 1969 guaranteed its debt to AIC. On October 20, 1969, he conveyed his interest in their house, which had been acquired in 1963 or 1964, to his wife, Isabel. About the same time, he also transferred his 1969 automobile to Isabel.

Throughout their ten years of marriage, he followed his father's practice of turning over to his wife substantially all funds coming into his hands. In June 1968, Isabel converted their joint account into a Totten trust account. Vecchione, Jr. testified that she did this so that he would not be able to withdraw the money himself, although he also testified that he never withdrew money himself from the joint account.

While a series of transfers by a debtor may be innocuous when viewed *in vacuo*, an inference of irregularity arises from a series of such transfers. See generally 2 Wigmore on Evidence § 333. The inference of impropriety is bolstered here by the parallel course of conduct of the bankrupts, father and son.

■ While it is for the bankruptcy judge in the first instance to decide whether an inference should be drawn, where the questioned conclusion is one of ultimate fact, as is the question of concealment, *Stewart v. Ganey*, 116 F.2d 1010, 1013 (5 Cir. 1941); *Minnick v. Lafayette Loan & Trust Company*, 392 F.2d 973, 976–77 (7 Cir. 1968), this court may exercise a greater degree of review and is free to draw its own conclusions from

undisputed facts. *Cf. Costello v. Fazio*, 256 F.2d 903, 908 (9 Cir. 1958); *Solomon v. Northwestern State Bank*, 327 F.2d 720, 724 (8 Cir. 1964); *In re Morasco*, 233 F.2d 11, 15 (2 Cir. 1956).

Here, the bankruptcy judge rested his conclusions in part on his acceptance of the bankrupts' testimony that there was no improper motivation behind the asset transfers. This court does not dispute his acceptance of their testimony,[3] "[but] is of opinion that [credibility] cannot be viewed as a controlling factor in resolving the principal questions tendered by the . . . objections[s]." *In re Lurie*, 385 F.Supp. 784, 786 (E.D.N.Y.1974). Rather, the court feels compelled to draw the inference of concealment from the conceded underlying facts. This the court is free to do. *Cf. In re Caplan*, 149 F.2d 731, 732 (2 Cir. 1945); *In re Gurney*, 71 F.2d 144, 146 (2 Cir. 1934); *In re Rowe*, 234 F.Supp. 114, 116 (E.D.N.Y. 1964).

■ Additionally, in reaching his ultimate findings the bankruptcy judge erred as a matter of law in refusing to consider the parallel course of conduct of both bankrupts,[4] further undermining the validity of his conclusions. See *United States v. United States Gypsum Company*, 333 U.S. 364, 394–96, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

Moreover, the reasons given by the bankruptcy judge for concluding as he did as to each transfer will not withstand analysis. In finding no concealment as to the houses transferred, the bankruptcy judge relied in part on the fact that deeds of transfer were publicly filed. The inquiry here, however, is not whether creditors were misled in relying

---

**3.** The court also notes, however, that, as urged by appellants, there was testimony by the bankrupts themselves which tended to contradict the bankruptcy judge's findings. For example, the following exchange took place during the cross-examination of Vecchione, Sr.:

"Q. And was there any understanding with your wife about this money that you gave her? Was she to save it for you?

"A. I had no understanding with her whatever. She took care of all the household bills, and that was all.

"Q. Was she to save it for you?

"A. She was to save it *for herself and for me.*" Tr. 117–18 (emphasis supplied).

**4.** It is unclear from the bankruptcy judge's decision whether he even considered each bankrupt's asset transfers as part of a total picture as opposed to isolated occurrences.

on assets the bankrupts purported to own but, rather, whether the bankrupts have concealed from the trustee assets in which they retain equitable interests. The status of record title to the property is certainly not determinative of equitable ownership. See, *e. g., In re Beam*, 163 F.Supp. 333, 335 (N.D.Ala.1958).

The bankruptcy judge's conclusion that adequate consideration was received for the interests conveyed is also of dubious validity. There is no question that the monies paid the bankrupts for the interests were funds originally given by them to their wives and, as will be seen from the discussion below, could just as easily have been "borrowed" back by the bankrupts, if they needed the money.

Finally, *In re Molden, supra*, relied on by the bankrupt for the proposition that a secret trust is not established by virtue of the bankrupts continuing to live in the houses after the transfer, is inapposite. In *Molden, supra*, the bankrupt had quit-claimed to his wife his interest in jointly owned property in consideration for her surrendering two of his promissory notes. The objecting creditor there argued that since the bankrupt continued to reside on the conveyed premises, a secret trust should be held to exist. In rejecting that argument, the Court of Appeals stated, "We cannot agree that in these circumstances a secret trust has been shown to exist." 300 F.2d at 8. The circumstances undoubtedly alluded to were that it was the bankrupt's wife who not only made the total cash down-payment for the house but also paid the mortgage, taxes and all other expenses out of funds either earned or inherited by her. Here, all expenses relating to the houses were paid both before and after the conveyances out of money earned by the bankrupts. See *In re Davis*, 404 F.2d 312, 313–14 (2 Cir. 1968); *In re Walter*, 67 F.Supp. 925, 926 (S.D.N.Y.1946). See also *In re Elliot*, 83 F.Supp. 771 (E.D.Pa. 1948), *aff'd*, 173 F.2d 895 (3 Cir. 1949), in which a concealment was found and a discharge denied because the bankrupt had failed to list as an asset an interest in the house in which he lived and on which he had repaid a $1600 mortgage. The house had been purchased in his wife's name and she had paid $590.63 out of her own funds as a down payment.

Similarly, the consideration received by the bankrupt for the transfers of their cars was, in Vecchione, Sr.'s case, questionable and, in Vecchione, Jr.'s, totally illusory. The bankruptcy judge found that Vecchione, Sr. transferred his car to Mary in partial repayment of money he owed her and because he paid the automobile bills. Both Vecchione, Sr. and Mary testified that no records of these "loans" or their repayment were ever kept. Nor is there any question that Mary pays the car bills with money given her by Vecchione, Sr.

Vecchione, Jr. testified, and the bankruptcy judge found, that he transferred his car to Isabel because he could not afford to make the payments on the car. However, Vecchione, Jr. further testified that Isabel made the car payments out of funds he gave her!

Nor did the bankruptcy judge allude to the fact that both bankrupts continued to use the cars after the transfers in the same manner and to the same extent they did before. In fact, Mary testified that she uses the car only when her husband does not need it.

Finally, the bankruptcy judge concluded that money accumulated by the bankrupts' wives belonged to them exclusively. In fact, however, these funds were always available for the bankrupts' use when desired. Both Mary and Isabel testified that they never turned their husbands down when a "loan" was requested, never kept any records of these "loans," never charged any interest on the "loans" and forgave any remaining indebtedness when the bankrupts filed their petitions in bankruptcy.

For the same reason *Neiderheiser, supra*, relied on by the bankruptcy judge for the proposition that it is not unusual for husbands to turn over their earnings to their wives, is not persuasive here. In *Neiderheiser, supra*, the bankrupt was

charged with concealing his interest in land transferred to his wife in satisfaction of a $500 loan made a month before the conveyance. The $500 was saved by the wife from the bankrupt's earnings. The Court of Appeals affirmed the granting of a discharge holding that although the circumstances were suspicious they would respect the referee's findings.

The suspicious circumstances in that case, however, do not even begin to equal the questionable "borrowing" of monies present here.

Similarly, *In re Lee*, 51 F.2d 394 (N.D. Ga.1931), relied on by the bankrupts, is factually inapposite. There, as here, the bankrupt was charged with retaining an interest in a bank account in his wife's name. There, as here, the wife kept as her own the excess over amounts given her by her husband for household expenses. At this point, however, the similarity ends. In the eleven months preceding the bankruptcy in *Lee, supra,* the bankrupt's wife made only four deposits totalling $241. Additionally, the wife worked and had an income of her own. In granting the discharge, the court stated:

> "A husband has the right to give his wife *small parts* of his earnings from time to time, provided same are not unreasonable in relation to his earnings, and not made with intent to defraud his creditors." 51 F.2d at 395 (emphasis supplied).

Here, on the day they filed their petitions in bankruptcy, the bankrupts had legal title to no assets while, in effect, they enjoyed the equitable use of houses, cars [5] and bank balances, totalling, in Vecchione, Sr.'s case, over $50,000 and, in Vecchione, Jr.'s case, slightly under $14,000. While each of the challenged asset transfers alone might be considered innocent, the totality of the situation is such that the court is impelled to conclude that both bankrupts have retained equitable interests in assets transferred to their wives.

Nor can it be said that these concealments were not both knowing and fraudulent. It strains credulity even to suggest that these parallel series of asset transfers by father and son for questionable or illusory considerations to their wives over a period of time when they were undertaking large financial commitments were of an innocent nature.[6] While each suspicious transfer alone might give rise to two possible inferences, one of innocence and one of deceit, and the decision of the trier of fact to draw one inference in place of the other would, perhaps, be final, the cumulative effect of the parallel courses of conduct present here gives rise, as a matter of law, to only one permissible inference—that both bankrupts knowingly and fraudulently attempted to place their assets beyond the reach of their creditors and potential creditors while retaining the equitable enjoyment of those assets. It is also unavailing that the bankrupts revealed to the trustee that the asset transfers had taken place. *Cf. United States v. Zimmerman*, 158 F.2d 559, 560 (7 Cir. 1946), and cases cited therein.

The court is mindful that the statutory grounds for objecting to discharges are to be liberally construed in

---

5. The bankrupts cite *In re Pioch*, 235 F.2d 903 (3 Cir. 1956), for the proposition that a transfer of an automobile in consideration for the transferee paying the car loan and maintenance expenses is not fraudulent even if the bankrupt continues to use the automobile after the transfer. In *Pioch, supra,* however, the transfer was to the bankrupt's employer, who paid the car loan and maintenance bills. Here, the transfer was to the bankrupts' wives, who made the various payments *with money given them by the bankrupts.*

6. Particularly egregious were the automobile transfers, both of which occurred in 1969 or 1970, a period in which both Salro and Vecchione, Sr.'s financial problems were crystallizing. As discussed above, there was in Vecchione, Sr.'s case at best a questionable consideration for the transfer and in Vecchione, Jr.'s case no consideration at all. Both bankrupts continued to have the unfettered use of the vehicles after the transfer and in effect paid all the bills.

favor of the bankrupt. However, as was said in *In re Quackenbush, supra,* 102 F. at 285:

> "the purpose of the lawmakers was to grant [a discharge] only to the honest bankrupt who surrenders all that he possesses to his creditors and not to one who by a process of legal necromancy is living in luxury upon an estate which equitably belongs to them. It would be an exceedingly narrow construction to hold that the bankrupt avoids the charge of concealment because he informs the trustee of the plan adopted to effectuate the fraud." [7]

See also *In re Becker,* 106 F. 54, 56 (N.D. N.Y.), *aff'd,* 112 F. 1020 (2 Cir. 1901). But see *In re Hennebry,* 207 F. 882, 885 (N.D.Iowa 1913).

Accordingly, the court concludes that appellants have sustained their burden of proving that the bankrupts have retained interests in assets transferred to their wives and that their concealments were sufficiently knowing and fraudulent to bar their discharges, *In re Baxter, supra* ; *In re Agnew,* 225 F. 650, 654 (N.D.N.Y.1915); *Hudson v. Mercantile National Bank,* 119 F. 346, 349 (8 Cir. 1902). That portion of the bankruptcy judge's decision which dismissed the specifications of objection based on fraudulent concealments is therefore reversed.[8]

### IV. *The Rotomotive Contract*

Appellants charged both bankrupts with failing to list in their asset schedules monies owed them by Rotomotive and/or Salro. 11 U.S.C. § 32(c)(1). According to appellants, under a handwritten agreement dated May 17, 1971 between the bankrupts, Rotodyne, Salro and Rotomotive, the latter two acknowledged debts of $10,000 to Vecchione, Sr., $5,000 to Vecchione, Jr. and an additional $15,000 to each of them. The two $15,000 amounts reflected the collateral deposits made by the bankrupts on Salro's behalf with AIC; the $10,000 amount represented a loan made by Vecchione, Sr. to Salro in 1970 or 1971; and the $5,000 amount represented money given to Salro by Vecchione, Jr., either as a loan or to purchase stock which was never issued.

There is no question that the bankrupts did not list as assets on their respective schedules any sums owing from either Salro or Rotomotive. The bankrupts contend, however, that they are not owed any money by Rotomotive and/or Salro because the obligations recited in the May 17 agreement were contingent on the corporations obtaining a $240,000 loan which never materialized. The bankruptcy judge accepted the bankrupts' version and found that the obligations related in the May 17 agreement were subject to an unfulfilled condition precedent and were consequently unenforceable.

In this court, appellants argue that the finding was clearly erroneous. Their argument is premised, for the most part, on the fact that Vecchione, Jr. actually received $4,000 from Salro in July 1971 and that Rotodyne actually performed under a different provision of the May 17 agreement requiring it to indemnify the bankrupts with respect to a $13,333 obligation to CIT. Appellants assert that these partial performances clearly evidence the non-contingent nature of the obligations set forth in the May 17 agreement.

---

**7.** Along the same lines, the court in *Neiderheiser, supra,* admonished:

> "Courts ought to be very careful to see that a bankrupt does not by short turns and ingenious devices arrange with his relatives to defraud his creditors . . . ." 45 F.2d at 492.

**8.** Because the court believes that the § 14(c)(1) concealment specifications have been established as to the houses, cars and funds, it is unnecessary to decide whether the § 14(c)(4) specifications were also sustained. Nor is it necessary to decide whether there is a concealment as to the Axe Science Fund shares transferred by Vecchione, Jr. to his wife.

**620**

■ The interpretation or construction of provisions in a contract normally involves ascertaining the intention of the parties. 4 Williston on Contracts § 601. The starting point for analysis is obviously the language of the contract itself. Here, the relevant portions of the May 17 agreement are sufficiently ambiguous as to the parties' actual intention to require amplification via oral testimony. *Cf. Heyman v. Commerce and Industry Insurance Company*, 524 F.2d 1317, 1320 (2 Cir. 1975).

■ The understanding of the bankrupts, as revealed by their testimony, was that the obligations were contingent and that nothing was owed them under the agreement. Vecchione, Sr. testified that the agreement was executed as an inducement to him and his son to operate the plant. This testimony is supported by the fact that apparently neither the bankrupts nor the trustee have taken any steps to collect these "debts." See 7 Remington on Bankruptcy, ¶ 3218. As the bankruptcy judge noted, it is unlikely that these bankrupts would voluntarily disavow an interest in money owed them.

Moreover, any claim which the bankrupts may have had to their respective $15,000 deposits was waived as part of Salro's Chapter XI plan which was confirmed in March 1970.

Vecchione, Jr. explained that the $4,000 check issued by Salro was in repayment of a loan made to Rotomotive. The loan was apparently made a year earlier by Vecchione, Sr.'s wife ($3,000) and Vecchione, Jr.'s wife ($1,000). Bankbooks received in evidence corroborate that withdrawals of $3,000 and $1,000 were made in April 1970 and corresponding deposits made in July 1971. It thus appears that this $4,000 payment by Salro did not relate directly to the May 17 agreement but was an independently enforceable obligation of Salro and/or Rotomotive.

Vecchione, Jr. also explained that Rotodyne agreed to indemnify both himself and his father with respect to the $13,333 obligation to CIT because Rotodyne had purchased from Salro the equipment originally purchased from CIT, and the $13,333 merely represented the unpaid balance of that original purchase.

Finally, John L. Shea, an accountant working for Salro who actually drafted the May 17 agreement, testified in substance that it was his understanding of the parties' intention that the "debts" were collectible only if the loan were negotiated.

While the matter is not wholly free from doubt, the findings of the bankruptcy judge, based as they were on the testimony of the bankrupts and Shea as to the intentions of the parties, must be accorded great weight. On the whole, the court cannot conclude that these findings were clearly erroneous, Bankruptcy Rule 810. The decision of the bankruptcy judge dismissing the specifications of objection relating to the Rotomotive contract is therefore affirmed.

Accordingly, the decision of the bankruptcy judge is affirmed in part and reversed in part, and the matter is remanded to the bankruptcy court for the entry of orders vacating the discharges heretofore granted the respective bankrupts and denying them a discharge consistent with this opinion.

So ordered.