**In the Matter of Arthur FRUMOVITZ, Bankrupt.**

**METROPOLITAN PETROLEUM COMPANY, Plaintiff,**

v.

**Arthur FRUMOVITZ, Defendant.**

**Bankruptcy No. 79–1112–BK–JE–JAG. Adv. No. 1.**

United States Bankruptcy Court, S. D. Florida.

March 4, 1981.

Joseph Blonsky, Mann & Dady, Miami, Fla., for plaintiff.

Theodore P. Sobo, Sobo, Wellens & Balocco, Fort Lauderdale, Fla., for defendant/bankrupt.

Raymond B. Ray, Britton, Cohen, Kaufman, Benson & Schantz, Fort Lauderdale, Fla., for trustee.

A. W. Beck, Plantation, Fla., Trustee.

FINDINGS AND CONCLUSIONS

JOSEPH A. GASSEN, Bankruptcy Judge.

Plaintiff, Metropolitan Petroleum Company, filed its complaint to deny discharge of the debtor-defendant, Arthur Frumovitz, in this pre-code case, citing § 14(c)(1) of the Bankruptcy Act (11 U.S.C. § 32). Subsequently, it also cited § 14(c)(4) as authority for the denial of the debtor's discharge.

Prohibited acts of the debtor alleged by the plaintiff included his concealment of funds from the settlement of a legal action and of proceeds from business contracts; the transfer by the debtor to his wife of his interest in their New York home held as a tenancy by the entirety, and later, a similar transaction with their Florida condominium, and the delivery of $10,000 in settlement funds and $2,900 in cash to his wife; the failure to list these assets on his schedules; the use by the debtor of an assumed name, or his misrepresentations regarding the use of it; the debtor's sham incorporation of his Florida business; his failure to keep books and records in his business; and the concealment of cash. Count III, on the failure to schedule assets, was dismissed prior to trial.

Prior to 1976, the debtor, Arthur Frumovitz, operated the Mandel Coal and Oil Company, a family corporation, which at that point was owned wholly by the debtor. Mandel was in the fuel oil business and the plaintiff, Metropolitan, was its major supplier. Mandel was hurt by the rising price of oil and incurred a substantial debt to Metropolitan, all of which was personally guaranteed by the debtor individually. At some point, Metropolitan sought to obtain the personal guaranty of the debtor's wife, but she would not agree to it.

In 1973, the debtor and his wife refinanced their home, held as a tenancy by the entirety. They gave $15,000 of the loan proceeds to Metropolitan in payment of the pre-existing debt. Frumovitz testified that Mandel Coal carried the $15,000 on its book as a loan payable to himself and his wife. He also testified that he had had an agreement with Metropolitan to release his personal guaranty if this payment was made. Edward T. Joyce, successor credit manager for Metropolitan, testified from his examination of the records of the company, and stated that a termination of the personal guaranty had been contemplated only if Metropolitan obtained a security interest in accounts receivable, which was never done. The court finds that, whatever Frumovitz's belief, the personal guaranty remained in full effect.

Oil prices continued to rise and Mandel Coal again increased its debt to Metropolitan, so that by 1976 it amounted to approximately $58,000. Joyce testified that Mandel was not further in arrears in 1976 than in 1973, but that the total debt may have been higher because the price of oil was higher. In December, 1976, Metropolitan filed an action in New York State Court against Frumovitz individually on his personal guaranty. On December 6, 1976, the same day as his answer was filed in that suit, Frumovitz conveyed his interest in the couple's residence to his wife so that the house was thereafter held solely in her name. He testified that she insisted on this protection because of the 1972 transaction in which the house had been encumbered in order to pay Metropolitan.

On April 29, 1977, the house was sold, netting $6,800. This fund was preserved and was subsequently used in the $5,500 down payment and closing on the couple's Florida condominium. The New York house had been sold for $40,000 and the Florida condominium was purchased for $39,000. Frumovitz testified that the condominium was taken in the names of both the debtor and his wife, as required by the lending bank. On November 16, 1978, the debtor deeded his interest in the Florida condominium to his wife, so that their home was again held in her name alone.

In 1976, Mandel Coal ceased operations. The customer list was sold to B.G.S. Oil Services, Inc. for $20,000, with Frumovitz receiving a $10,000 check in October, 1976 and $10,000 in cash over the next month or so. In addition, $18,000 worth of accounts receivable were collected for Mandel Coal. Of these amounts, Frumovitz testified that $5,000 was paid to Metropolitan on its debt, and the balance went to taxes and living expenses.

Litigation resulted between Mandel Coal and B.G.S. on the agreement made when Mandel went out of business. At the same time, Frumovitz was in litigation with a third person, who also had a separate law suit with B.G.S. All of the litigation was

consolidated in a settlement which netted $12,977 to Frumovitz in December 1978. Frumovitz testified that he considered these to be proceeds to Mandel Coal, and therefore, gave his wife $10,000 as repayment of her share of the 1979 loan. The balance of approximately $2,900 was placed in the corporate account of Gulliver's, his Florida business, and later removed and used by his wife for a European vacation.

In the early part of 1977, the debtor came to Florida and his wife followed after the New York house was sold in April, 1977.

When Frumovitz came to Florida he became a route distributor of prepared salads. He began business in May, 1977 and incorporated, as Gulliver's, Inc. in September, 1977. The supplier for whom Frumovitz handles accounts testified that initially he only agreed to deal with Frumovitz individually, but finally agreed to deal with the corporation. Upon incorporation, the debtor's wife was made the sole stockholder and the debtor became president of the corporation. Frumovitz currently services forty to sixty accounts, with fluctuations on a seasonal basis.

The corporation had $1,000 in start-up costs, primarily for a refrigerated van in which to deliver the salads. A high proportion of the accounts are paid in cash. Frumovitz deposits the checks each day and sometimes deposits the cash. No cash journals are kept. Since January, 1979, Frumovitz has made $350 to $360 per week salary. $200 of that is paid to him by check, and the balance of approximately $150 per week is taken from the cash receipts to pay for gasoline and groceries. In addition, payments on the 1978 Dodge registered in Frumovitz's name, are made by the corporation. Also, Gulliver's pays for the attorneys used by Frumovitz personally.

Since July, 1977, defendant has used the name David Russel on his telephone account and for his listing. He testified that he did not want to be bothered by creditors calling him and that a telephone company employee said he could do that rather than paying for an unlisted number.

At the time Mandel Coal went out of business, Frumovitz had $1,400 in his personal savings account. Defendant testified as to the use of the funds received when Mandel Coal ceased operations. Approximately $8,000 went for his son's Bar Mitzvah on December 19, 1976. The cost of moving the debtor's household from New York to Florida in July, 1977 was $2,200. $5,500 went into a business venture which failed almost immediately thereafter. The debtor spent $1,400 for a 1962 Chris Craft boat in April or May, 1977 and then spent $1,385 to ship it to Florida. It was later sold for $2,000 and those cash proceeds went for current living expenses. The debtor used $1,000 to buy a used van in May, 1977 for his salad business and applied another $2,000 as a down payment for a new van for the business in about September, 1977. The rest was used in living expenses, including rent after the sale of the New York house and for the debtor in Florida before his family moved, and for air fare between New York and Florida. It is not clear whether the $10,000 delivered to the debtor's wife still exists as a separate fund, or whether it too has been used for family living expenses.

Frumovitz filed his voluntary petition in bankruptcy on September 21, 1979.

Section 14(c)(4) bars the discharge of the bankrupt who has

> . . . at any time subsequent to the first day of the twelve months immediately preceding the filing of the petition in bankruptcy, transferred, removed, destroyed, or concealed, or permitted to be removed, destroyed, or concealed, any of his property, with intent to hinder, delay, or defraud his creditors; . . .

Section 14(c)(1) prevents the discharge of a bankrupt who has committed an offense punishable by imprisonment under 18 U.S.C. § 152. Section 152 makes punishable one who

> . . . knowingly and fraudulently conceals from the . . . trustee . . . or other officer of the court charged with the control or custody of property, or from creditors in any bankruptcy proceeding, any property

belonging to the estate of a bankrupt; . . .

and one who

. . . either individually or as an agent or officer of any person or corporation, in contemplation of a bankruptcy proceeding by or against him or any other person or corporation, or with intent to defeat the bankruptcy law, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation; . . .

■ The court finds that the plaintiff has carried its burden under Bankruptcy Rule 407 of proving facts which require that the debtor's discharge be denied. First, the debtor's delivery to his wife of the $10,000 certificate of deposit out of the $12,977 New York settlement is a bar to his discharge under § 14(c)(4). The act occurred during the twelve months preceding the filing of his voluntary petition in bankruptcy and was a transfer made with the intent to hinder, delay or defraud his creditors. Frumovitz explained the delivery of the $10,000 to his wife as repayment of her share of the loan to Mandel Coal. His testimony on the amount of the 1973 loan to Mandel Coal was inconsistent, but the more frequent and more believable testimony was that the loan was for $15,000, (rather than the full $20,000 netted in the refinancing.) On that basis, the $10,000 exceeded the wife's share. Even if the loan had been for $20,000, in these circumstances, repayment of a full $10,000 to the wife and less than $3,000 to the husband, was wrongful as to Frumovitz's creditors.

Mandel Coal, although a corporation, was essentially Arthur Frumovitz, and it was actually the debtor, not the corporation, who decided that the "corporate" funds would go to the debtor's wife, thus being out of the reach of Frumovitz's creditors. But it is not clear that the money was in fact, Mandel's. Frumovitz personally had assigned the Mandel customer lists, which contract was a part of the New York litigation. Other aspects of the litigation also involved Arthur Frumovitz, individually, and the settlement proceeds may as well have belonged to Arthur Frumovitz as to Mandel Coal. In addition, Frumovitz's earlier assignment of his interest in the family home to his wife had already been made to recompensate her for this same loan.

As has been stated so succinctly:

Persons whose intention it is to shield their assets from creditor attack while continuing to derive the equitable benefit of those assets rarely announce their purpose. Instead, if their intention is to be known, it must be gleaned from inferences drawn from a course of conduct. *Sacklow v. Vecchione*, 407 F.Supp. 609, 615 (E.D.N.Y.1976).

The cumulative effect of all the debtor's actions clearly supports the inference that he had the actual intent to hinder, delay or defraud his creditors by giving the $10,000 certificate of deposit to his wife.

■ The debtor's operation of his business in the form of a corporation, all of whose shares were owned by his wife, is likewise a bar to his discharge under § 14(c)(4). There *are* certain facts which militate against such a conclusion. This was a completely new business with minimal assets commenced by the debtor and incorporated shortly after that commencement. It was not an ongoing valuable business suddenly incorporated, with substantial assets thereby snatched from access by creditors. The incorporation occurred two years prior to his filing bankruptcy. The value of the stock of the corporation or the value of the underlying corporate assets, if either were property of the estate, would be minimal. The sole valuable asset of the corporation appears to be the van in which Frumovitz delivers the potato salad and cole slaw. There was no evidence that the corporate customer list would be assignable or valuable. As far as current income from the business is concerned, the corporate form seems to have had no practical effect as to the creditors. Apparently all income of the corporation went to Frumovitz, and was then as accessible to creditors as if no corporation existed.

On balance, however, it must be concluded that the debtor's use of this corporation

wrongfully harmed his creditors. Although the incorporation may not have been in actual contemplation of bankruptcy, because of the personal guaranty, Frumovitz was clearly insolvent at the time of the incorporation. What capital there was invested came from the debtor. He was the sole person actually and actively involved in the corporation and its success depended solely on his continued efforts in servicing the salad distribution accounts. He treated the business as his own and failed to maintain the formalities of the corporate form. Yet he made a gift of the entire stock of the corporation to his wife, who contributed nothing in either capital or services. As a result, whatever increase in equity comes about in the future through the debtor's labor will be protected from his creditors, while being available for his benefit or to fulfill his legal obligations of support for his family. There was no explanation given for such a gift to his wife and it must be concluded that it was to avoid the debtor's creditors.

Although the initial incorporation and issuance of stock occurred more than twelve months before bankruptcy, the ongoing operation of the debtor's business in that form was a continuing concealment or transfer with fraudulent intent during the twelve-month period of § 14(c)(4).

This court finds that the debtor's transfer to his wife of his interests in the Florida and New York homes would *not* bar his discharge. The Florida transfer did occur during the twelve month period prior to bankruptcy. The debtor testified that the down payment for the Florida condominium was made with the wife's funds realized upon her sale of the New York home, and that the Florida condominium had initially been taken in both names only to satisfy the mortgage lender. The wife's title to the funds from New York may have been tainted by the probably fraudulent transfer there which had first made the New York house hers alone, and the lender's requirement emphasizes the very fact that it is the debtor who has been making the payments on the residence, the equity in which is

accruing to his wife. However, prior to its transfer, the Florida condominium was held as a tenancy by the entirety and thus, under Florida law, could not be reached by plaintiff at that time, and would have been exempt property in this proceeding. The court finds no extrinsic fraud in the creation of the exemption upon the Frumovitzes' move to Florida. (Cf. *Bank of Pennsylvania v. Adlman*, 541 F.2d 999 (2d Cir. 1976). Therefore, the debtor's action in transferring the Florida condominium did not deprive this creditor of property it might otherwise have reached, and the transfer cannot be the cause of denying the debtor's discharge under § 14(c)(1) or (c)(4).

Because a debtor spouse's interest in a tenancy by the entirety can be reached by creditors in New York, (see *In re Weiss* 4 B.R. 327 (Bkrtcy.Ct., S.D.N.Y., 1980),) it appears that the deed to his wife there would have been a fraudulent conveyance, minimal though the value of his interest was. That transaction occurred long before bankruptcy and the court does not find that it was in contemplation of bankruptcy, although it was quite clearly intended to put the property beyond the reach of Metropolitan Oil at that time. Whether that act so taints the present disposition of the debtor's property so as to bar his discharge is a question this court need not decide because the discharge is barred on other grounds. However, it is important as part of the pattern of actions by the debtor which makes it absolutely clear that he had the intent to conceal or transfer property to the detriment of his creditors.

The court also finds that the debtor's use of a fictitious name for his telephone listing is not a bar to his discharge.

The particular actions complained of did not do serious harm to the debtor's creditors. It appears that most of the property transferred to his wife went ultimately to living expenses of the family which debtor would otherwise have paid for directly. While the family's expenditures may have been extravagant in view of their existing debts and current income, there is not clear evidence that defendant, by these actions,

secreted substantial assets which will be available to him later. (It is possible the $10,000 certificate of deposit is still held in his wife's name, but the evidence was not clear on that point.) However, whatever the success of his endeavors, the evidence clearly shows that the debtor had the intent and made the attempt to prevent his creditors reaching assets which should rightfully have been available to them. As such, he does not fall within that class of "honest but unfortunate" debtors who may be discharged in bankruptcy.

As required by Bankruptcy Rule 921(a), a separate Judgment incorporating these Findings and Conclusions is being entered this date.