In re Frank F. OGALIN, Debtor.

The Cadle Company, Plaintiff,

v.

Frank F. Ogalin, Defendant.

Bankruptcy No. 00–32944(ASD).
Adversary No. 00–3188.

United States Bankruptcy Court,
D. Connecticut.

Jan. 23, 2004.

---

Paul N. Gilmore, Updike, Kelly & Spellacy, P.C., Hartford, CT, for Plaintiff.

Roy W. Moss, Rowayton, CT, for Debtor–Defendant.

## MEMORANDUM OF DECISION ON OBJECTION TO DISCHARGE

ALBERT S. DABROWSKI, Chief Judge.

## I. INTRODUCTION

In this adversary proceeding one of the Debtor's creditors challenges his entitlement to a discharge of debts under Chapter 7 of the Bankruptcy Code. For the reasons stated herein, the Court will sustain the Plaintiff's claim and deny the Debtor's discharge.

## II. JURISDICTION

The United States District Court for the District of Connecticut has subject matter jurisdiction over the instant adversary proceeding by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1). This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(J).

## III. GENERAL FACTUAL BACKGROUND

This factual background is derived from the testimonial and documentary evidence received at trial, as well as the Court's own noticing of the official files and records of this case and adversary proceeding.

In or about June 1989, the Debtor, Frank Ogalin (hereafter occasionally referred to as "Frank"), and his brother, Jeffrey Ogalin (hereafter, "Jeffrey"), incorporated a drywall construction business known as Walls & Ceilings, Inc. (hereafter, "W & C"). In connection with the operation of W & C, Frank and Jeffrey incurred significant unpaid debts, including "responsible person" tax liability exceeding the sum of $100,000.00, for failure to remit federal withholding taxes on employee wages. Not later than February 1991, certain of Frank's tax obligations had ripened into federal tax liens encumbering his

property.[1]

In May, 1991, Frank and Jeffrey ceased operating W & C, and were involved in the formation and operation of another family-owned drywall construction firm—Drywall Construction Corp. (hereafter, the "Corporation"). Frank's and Jeffrey's mother, Margaret Ogalin (hereafter, "Margaret"), was the incorporator of the Corporation, and their respective wives—Verna Ogalin (hereafter, "Verna") and Marie Ogalin (hereafter, "Marie") were the original shareholders. The initial directors of the Corporation were Frank and Jeffrey. In addition, Jeffrey was named as its President and Treasurer, and Frank its Vice President and Secretary.

Verna contributed approximately $2000.00 to the Corporation in consideration for her 50% equity interest therein. At its inception the Corporation had business equipment with a value of approximately $5000.00, although the identity of the contributor of those assets was not disclosed on the record.

In the year 1994, Jeffrey ceased his involvement with the Corporation, and began a business of his own. According to Frank and Jeffrey, the Corporation did not have enough business at that time to support two families, so Jeffrey moved on to an independent venture. Upon Jeffrey's departure from the Corporation, Verna became its President. Also in connection with Jeffrey's departure, Marie transferred her portion of the stock of the Corporation to Verna for no monetary consideration. According to Frank, this transfer occurred at the behest of Verna.

On the same day that she received Marie's shares, Verna transferred her resulting 100% equity interest in the Corporation (hereafter, the "Stock") to Christina Ogalin (hereafter, "Christina")—her and Frank's eldest daughter—in the following fashion: 25% directly to Christina, and 75% to Christina as trustee for her three younger siblings. Christina was 15 years of age at that time.

Christina also worked for the Corporation, having begun such employment in 1995 at the age of 16. Her part-time duties were largely limited to working with payroll and subcontractor records. After graduation from high school in 1996, Christina became a full-time employee of the Corporation. At all times relevant to this proceeding Christina lived with her parents and younger siblings.

In 1997, at the urging of Verna, Frank resigned as an officer of the Corporation. At that time Christina took over as Vice–President and Secretary. Verna remained as President. In January 1999, at the age of 20, Christina was promoted to President of the Corporation. Verna then became its Vice–President. In the five-year period, 1996 through 2000, the Corporation paid a total of $664,577.12 in wages (salary and bonuses) to Ogalin family members. Of that total, Christina received 65%; Verna received 26% and Frank received 9%.[2]

---

1. The record reveals that Internal Revenue Service (hereafter, "IRS") liens also encumbered the property of Verna Ogalin, Frank's wife. Exhibit J evidences a lien for "1040" income tax against Frank *and* Verna for Tax Years 1988 and 1989. Exhibits K and L evidence a lien against Frank *and* Verna for "6672" taxes for the period ending September 30, 1990.

2. The reported (W–2) wage income of Frank, Verna and Christina, and percentage of the total, in the subject time-frame is as follows:

| | Frank | Verna | Christina | Total |
|---|---|---|---|---|
| 1996 | –0– | $ 45,100.00 | $ 13,651.00 | $ 58,751.00 |

Within the time-frame relevant to this adversary proceeding, one or more members of the Ogalin family have held an interest in the following real estate: (i) 3425 Huntington Road, Stratford, Connecticut (hereafter, the "Huntington Road Property"); (ii) 1451 North Peters Lane, Stratford, Connecticut (hereafter, the "Peters Lane Property"); (iii) 283 High Ridge Road, Fairfield, Connecticut (hereafter, the "Fairfield Property"); and (iv) 38 Second Avenue, Seymour, Connecticut (hereafter, the "Seymour Property"). At all relevant times the Huntington Road Property was owned jointly by Frank and Jeffrey. This property had been their childhood residence, and was used by them thereafter as, *inter alia,* an office for W & C and the Corporation.[3] The Peters Lane Property appears to have been owned by Frank and Verna jointly.[4] It was the principal residence for them and their children until early 1999, at which time their interest was foreclosed by the holder of a mortgage thereon. At all relevant times, the Fairfield Property was solely owned by Christina. It was purchased by her in March, 1999, and became the principal residence of the Ogalin family following the foreclosure of the Peters Lane Property. The Seymour Property is a four-family residence which, at all relevant times, was wholly owned by Christina. As of the trial of this proceeding, she occupied one of the units there as her principal residence, having left the Fairfield Property in or about the Summer of 2001.

On June 30, 2000 (hereafter, the "Petition Date"), Frank commenced the instant bankruptcy case through the filing of a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code. Thereupon Barbara Hankin (hereafter, the "Trustee") was appointed trustee of the resulting bankruptcy estate.

The Plaintiff, The Cadle Company (hereafter occasionally, "Cadle") is a creditor of Frank. On December 13, 2000, Cadle commenced the instant adversary proceeding, seeking to have Frank's expected discharge denied under the authority of Bankruptcy Code Sections 727(a)(2)(A) and 727(a)(4)(A).

On June 28, 2002, on the basis of many of the same operative facts as are involved in this proceeding, the Trustee initiated an adversary proceeding (Adv.Pro. No. 02–3077(ASD)) against Verna, the four Ogalin children, and the Corporation, seeking to avoid certain "transfers" of property pursuant to, *inter alia,* Bankruptcy Code Sections 544 and 548 (hereafter, the "Avoidance Action"). On or about May 14, 2003, and pursuant to a public auction presided over by this Court, Cadle purchased the Trustee's interest in the Avoidance Action, which has not yet been tried, or consolidated with this proceeding.

## IV. DISCUSSION

### A. Legal Standards.

The granting or denial of a discharge in a Chapter 7 bankruptcy case is governed

| | Frank | Verna | Christina | Total |
|---|---|---|---|---|
| 1997 | –0– | $ 26,497.77 | $ 60,000.00 | $ 86,497.77 |
| 1998 | $ 34,500.00 | $ 26,000.00 | $149,770.00 | $210,270.00 |
| 1999 | $ 10,000.00 | $ 34,208.35 | $140,450.00 | $184,658.35 |
| 2000 | $ 15,000.00 | $ 41,200.00 | $ 68,200.00 | $124,400.00 |
| | $ 59,500.00 | $173,006.12 | $432,071.00 | $664,577.12 |
| | (9%) | (26%) | (65%) | |

3. This property also served as a residence for Margaret until her passing.

4. There was evidence in the record that both Frank and Verna were obligated on a mortgage encumbering the Peters Lane Property.

by Bankruptcy Code Section 727. The provisions of Code Section 727 implicated in the instant proceeding provide in pertinent part as follows:

(a) The court shall grant the debtor a discharge, unless—

\* \* \* \* \* \*

(2) the debtor, with intent to hinder, delay, or defraud a creditor ... has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; [or]

\* \* \* \* \* \*

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

\* \* \* \* \* \*

11 U.S.C. § 727 (2000).

█ The party objecting to the granting of a discharge bears the ultimate burden of persuasion by a preponderance of the evidence. Fed. R. Bankr.P. 4005; *cf. Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Further, given that the denial of a debtor's discharge "imposes an extreme penalty for wrongdoing", Section 727 "must be construed strictly against those who object to a debtor's discharge and 'liberally in favor of the bankrupt'". *In re Chalasani,* 92 F.3d 1300, 1310 (2d Cir.1996). Nevertheless, the relief of a bankruptcy discharge is not an absolute right, but rather, a privilege accorded to honest debtors who conduct their financial affairs with honesty and openness, and otherwise satisfy the Bankruptcy Code's statutory obligations.

**B. Section 727(a)(2).**

*1. The Plaintiff's Theory—Asset Diversion.*

The thrust of Cadle's claim is that since the demise of W & C, Frank has engaged in an effort to structure his personal and business financial affairs so as to hinder his creditors' attempts to collect the debts due from him. Specifically, Cadle believes that the Corporation derived its value largely through the effort and industry of Frank, and was, at all relevant times, fully within his control. Cadle claims that despite that economic reality, Frank (i) directed the placement of title to the Stock in his wife's, and later his children's, names; and (ii) avoided the receipt of substantial personal service income by placing Verna and Christina in figure-head positions, and channeling the vast majority of the Corporation's net income to them, permitting them to acquire property which he enjoyed essentially as his own through possession and use. Further, the fact that much of the relevant conduct may have occurred outside the one-year reach-back period of Section 727(a)(2)(A) does not deter Cadle since it alleges that those actions constitute *concealments* of property which, although initiated over one year before the Petition Date, *continue as such* to the present day.

*a. Continuing concealment.*

█ A "continuing concealment" doctrine is well-settled in sister Circuits. Under the classic formulation of that doctrine, a debtor's transfer of legal title to property prior to one year before the bankruptcy petition date, coupled with a retention of certain attributes of beneficial ownership into the one-year reach-back period of Section 727(a)(2)(A), can constitute a "concealment" within the meaning of that Section. *E.g., Rosen v. Bezner (In re Rosen),* 996 F.2d 1527, 1532 (3d Cir.1993); *In re Olivier,* 819 F.2d 550, 553 (5th Cir.1987); *In re*

*Kauffman*, 675 F.2d 127, 128 (7th Cir. 1981).

 The contours of the factual scenario in the present proceeding, however, do not fit this template precisely. Technically, Frank made no "transfers" of legal title. He never had a legal interest in the Stock to transfer to Verna. Instead, Verna received her legal interest in the Stock at the initial formation of the Corporation. Likewise, Frank never held legal title to the Fairfield Property. Instead, Christina acquired that real estate from an unrelated third party with funds she "earned" working for the Corporation. Nonetheless, the atypical structure of the concealment alleged here is not reason alone to absolve the Debtor of concealment in the one-year pre-petition period. As the Second Circuit Court of Appeals has counseled in the discharge context, disqualifying acts can be "as varied as the fish in the sea." *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1583 (2d Cir.1983).

The variety of misconduct which Cadle claims to exist in this case is concealment of *equitable* property interests retained not following transfer, but incident to *diversions* orchestrated by Frank. In a nutshell, the claim here is that there was an attempt to frustrate Frank's creditors by diverting the fruits of his industry to other Ogalin family members, who then provided him with use and enjoyment of material comforts purchased with those fruits.

Although the evidence of the flow of funds and other assets away from Frank strongly suggests that such movements were orchestrated to hinder the efforts of creditors to collect on their claims, there was no *direct* evidence that Frank himself was the "conductor", or that he acted with the illicit *mens rea* required under Section 727(a)(2). Rather, the direct evidence portrayed Frank as depressed and unengaged, and while generally aware of his creditors' claims and the actions of the Corporation and his family members, content simply to permit, and acquiesce in, the decisions made by Verna and Christina. Nonetheless, the record of this proceeding, and reasonable inferences therefrom, provide ample evidence of purposeful conduct by Frank intended to "hinder, delay or defraud" creditors within the meaning of Section 727(a)(2).

### b. *Badges of fraud.*

 Rarely, if ever, does a debtor admit to intentionally hindering, delaying or defrauding his creditors. Consequently, courts must often look to various "badges of fraud" to infer an illicit intention. "Badges" which are strong indicators of a debtor's illicit intent in a diversion/concealment scenario include the following:

(1) family or close relationship between the participants;

(2) lack of consideration for the property diverted;

(3) enjoyment of possession for use and benefit;

(4) financial condition of the debtor before and after the diversion;

(5) cumulative effect of transactions and course of conduct after financial difficulties arise; and

(6) general chronology and timing of events.

(hereafter, the "Badges"). *Cf. Kaiser*, 722 F.2d at 1582–83.

In the present case, the Badges weigh heavily against the Debtor–Defendant. First, the evidence reveals that there is a close family relationship between Frank, Verna and Christina—the primary participants in the relevant course of conduct. Second, Frank plainly enjoys possession, for his use and benefit, of significant items of property acquired and provided by Verna and/or Christina. Finally, while one

might conclude from the evidence that Frank received some value—the use and enjoyment of property—in consideration for his diversion of the fruits of his industry to his family members, the more fundamental and relevant question is the extent to which, *vis-a-vis his creditors*, Frank received *effective* consideration. In other words, the relevant inquiry is not simply whether Frank received consideration, but whether that consideration was in a form available for execution by creditors, *i.e.* an assessment of the extent to which such creditors were deprived of the value of the diverted property. In the language of the remaining Badges, this Court concludes, from the evidence as a whole, including the "general chronology of events", that the "cumulative effect of transactions and course of conduct" after Frank's financial difficulties arose was to hinder and delay his creditors.

Notwithstanding the weight of the Badges, and other evidence strongly suggestive of illicit purpose and conduct vis-a-vis creditors, the Ogalins would have this Court believe that the placement of ownership of the Corporation, and the direction of the vast majority of its earnings, into the hands of Frank's family members had nothing to do with the claims of his creditors. Verna and Christina testified at length as to the *bona fides* of their positions within the Corporation and the extent of their compensation therefrom. A recurring theme in their testimony was a general minimization of the role of Frank in the success of the enterprise. He was characterized as a depressed, part-time estimator whose poor management skills were a liability to the Corporation. By contrast, Christina, and to a lesser extent, Verna, were portrayed as energetic, competent, and hard-working employees executing the vast majority of the Corporation's business functions, and therefore largely responsible for its success. In general, the Ogalins' testimony, while credibly supportive of the competence and legitimacy of Verna and Christina's corporate stewardship, was not credible as to the degree of Frank's contribution to the business enterprise of the Corporation.[5] More fundamentally, however, nothing in the testimony of the Ogalins credibly supports their claim that the allocation of corporate resources away from Frank was done without reference to the hindering effect that such allocation would have upon the collection efforts of his creditors. This latter conclusion is illustrated by the Court's chronological summary, which follows.

### c. Chronology.

In 1991, at the time the Corporation was created, Frank and Verna were well aware of Frank's personal obligation to the IRS, which they believed might threaten any non-exempt property interest in Frank's name. Thus, on the advice of counsel,[6] the Stock was placed in the names of Verna and Marie, for monetary consideration ap-

---

5. The Court in fact finds that Frank was an indispensable element of the Corporation's success, and that he contributed at least as much value to the enterprise as did Verna and Christina.

6. There was inconsistent testimony on the question of *why* Verna and Marie were chosen as the original shareholders. Frank testified that he and Jeffrey did not decide to put the Stock in their wives' names. Instead, he claimed that Margaret (the incorporator), Verna and Marie decided to do it that way; and they simply did not "offer" him an equity interest. Marie, however, testified that the women did not decide the matter. Rather, she stated that the Corporation was wholly formed and run by Jeffrey and Frank. Jeffrey, interestingly, offered a third, and more plausible, view—that the Stock was placed in the names of Marie and Verna on the advice of counsel.

proximating the value of the physical assets to be possessed by the Corporation. By the time in 1994 when Frank concluded that he and Jeffrey would have to pursue independent business paths, Verna had concluded that Frank was a poor business manager, and resolved to take over the fiscal reigns of the Corporation, and leave Frank with control only over the operations (*e.g.*, job estimations, contract fulfillment, business production, etc.). Frank permitted this change, and Verna's assumption of Jeffrey's former office of company President, in part to appease her, in part because he agreed with her assessment of his strengths and weaknesses, and in part because it provided a vehicle for the Corporation to "legitimately" direct more of its income away from him, and thereby his creditors.

Simultaneous with Jeffrey's departure, his family's portion of the Stock was transferred from Marie to Verna. Verna's immediate reconveyance of the Stock to Christina—in her individual and fiduciary capacities—is corroborative of documentary evidence in the record [7] suggesting that at least by this time Verna had become concerned that her assets, too, were vulnerable to IRS tax liens, and perhaps the claims of other creditors.

Frank received no income from the Corporation in Tax Years 1995, 1996 and 1997,[8] even though he was working on the Corporation's business throughout that period, and remained its Vice President for most of that time. On March 1, 1997, the Corporation executed a series of changes orchestrated by Verna. At a special meeting of the Corporation's shareholders (Christina) and directors (Verna and Frank), Frank resigned as a Director and Vice President. Those positions were then assumed by his teenage daughter, Christina, who had worked full-time for the Corporation only since 1996. The Corporation also reallocated its payroll as part of these changes. In 1997, the wage income of the Ogalin family from the Corporation was distributed as follows: Christina (Vice President)—$60,000.00; Verna (President)—$26,497.77; Frank—$0.

In 1998, the Corporation apparently thrived. In that year, the wage income of the Ogalin family from the Corporation was distributed as follows: Christina (Vice President)—$149,770.00; Verna (President)—$26,000.00; Frank—$34,500.00.1999 would also prove to be a good year for business. Yet, in the early days of 1999, the Ogalins faced a significant family crisis—the foreclosure of their principal residence, the Peters Road Property. In light of that crisis, on or about January 10, 1999, at a special meeting of the Corporation's shareholders (Christina) and directors (Verna and Christina), Christina replaced Verna as President. Just days thereafter, Christina entered into a contract for the purchase of the Fairfield Property and, presumably, applied for the mortgage used to finance 90% of that purchase. It is clear to the Court that Christina's elevation within the Corporation was intended to facilitate her purchase of the Fairfield Property by, *inter alia*, bolstering and legitimizing her mortgage application.

One cannot read the foregoing account without being struck by the predominant role played by Verna in the events of relevance to this proceeding. Indeed, an understanding of Verna's competence, in-

---

7. *See* fn. 1.

8. This string of uncompensated years may have begun prior to 1995. However, the rec-

ord appears to contain no evidence as to Tax Years 1994 and earlier.

tentions and actions is the key to a resolution of this adversary proceeding.

After the demise of W & C, and the foundering of the Corporation in the early 1990's, it became clear to Verna that for all his technical expertise, Frank was not a sufficiently competent business person to run the Corporation in a profitable manner. To her credit, she acted decisively and competently in seizing control of the management of the business aspects of the Corporation, relegating her husband to estimating and the other technical aspects of the Corporation's enterprise (hereafter, the "Management Coup"). With this the Court can certainly find no moral fault; Verna acted legitimately to salvage the family's business for the preservation of their lifestyle.

However, Verna was not only focused upon the Corporation's ability to produce income going forward. She was also keenly aware of the fact that the business' past performance had left Frank's assets (and her own) vulnerable to the claims of creditors. She acted decisively to address this concern as well; first in the ownership of the Stock; later, in the payment of wages; and finally, in the ownership of real estate. In each of these areas, the record reveals a striking pattern of asset direction and allocation away from Frank, and to a somewhat lesser degree, away from Verna, and toward their eldest child, Christina. Christina's own testimony revealed a poised and competent young person. Yet to accept that Christina—a 20–year–old, still living at home—could become (i) the recipient of the Stock and the lion's share of the Corporation's income, and (ii) the owner of the family's principal residence and investment property, for any reason other than her parents' design in avoiding creditor executions, strains the credulity of this Court to the breaking point.

The asset direction and allocation orchestrated by Verna, like her Management Coup, was understandable under the circumstances. Nonetheless, unlike the Management Coup, the asset allocation strategy was illicit vis-a-vis creditors.

■ Plainly, Verna's intentions and conduct in orchestrating a strategy to hinder and delay the family's creditors, *standing alone,* do not bear on Frank's entitlement to a bankruptcy discharge. Nonetheless, when coupled with Frank's knowledge and acquiescence, Verna's conduct forms the basis for discharge disqualification under Section 727(a)(2)(A). The statute not only disqualifies a debtor for his own direct concealment, but also concealment which he "permitted". Here, Frank had intimate knowledge of Verna's strategy and permitted it, with a "wink and a nod", through his inaction.

In sum, the asset diversion conduct established on the record of this adversary proceeding is sufficient to disqualify the Debtor from discharge under the terms of Bankruptcy Code Section 727(a)(2)(A).

### 2. *Payments in Lieu of Wages.*

■ The asset diversion conduct discussed in the preceding section of this Memorandum of Decision is sufficient, standing alone, to disqualify the Debtor from the benefit of a bankruptcy discharge. Nonetheless, the record at trial also revealed a different, independently-disqualifying, pattern of misconduct vis-a-vis creditors—an effort by Frank to hide his actual wage income from taxing authorities, and other creditors, by having a large portion of the value of such wages transferred to his benefit through the Corporation's unreported direct payment and/or reimbursement of his personal expenses.[9]

9. This conduct was not alleged in the Com- plaint. It was elicited through testimony

Specifically, after being paid a salary of $34,500.00 in 1998, Frank "negotiated" with Christina for a decrease in that salary—to $10,000 in 1999, and $15,000 in 2000—so long as the Corporation paid and/or reimbursed certain of his personal expenses, including transportation, clothing, legal fees, etc. (hereafter, the "Payment-in-lieu Conduct").[10]

The "concealment" revealed by the Payment-in-lieu Conduct is more classically postured than the asset diversion conduct described in the preceding section of this Memorandum of Decision. For instance, the concealment of Year 2000 income first occurred within one year prior to the Petition Date, so that a claim respecting that conduct does not depend on a theory of *continuing* concealment for its viability. Also, most, if not all, of the assets concealed by the Payment-in-lieu Conduct— *i.e.* income in kind—were actually received and legally owned and retained by Frank, not diverted to others for title retention. Finally, whereas Frank's conduct with respect to the asset diversions might be fairly characterized as *passive*, in the course of the Payment-in-lieu Conduct he was shown to be *actively* engaged in an effort to keep the fruits of his industry shrouded, by initiating and negotiating a changed compensation scheme with Christina. In the parlance of Section 727(a)(2), he "concealed", not merely "permitted to be ... concealed".

In sum, the record makes plain that Frank intentionally secreted a significant portion of his personal service income in 1999 and 2000, by arranging to draw a relatively small salary, with the balance of his income received in the form of corporate direct payment and reimbursement of many of his personal expenses. By such efforts Frank intended to receive property "under the radar screen" of his creditors; and thus, such conduct is disqualifying of the right to a bankruptcy discharge under the authority of Section 727(a)(2)(A).

## C. Section 727(a)(4).

Given the Court's determination that the Debtor's discharge should be denied under the authority and standards of Bankruptcy Code Section 727(a)(2)(A), it is not necessary for the Court to consider the Plaintiff's claims under Section 727(a)(4).

## V. CONCLUSION

For the foregoing reasons, judgment shall enter in favor of the Plaintiff in this adversary proceeding. A judgment denying the Debtor's discharge shall enter simultaneously herewith.

## JUDGMENT

This adversary proceeding having come on for trial, and the Court having received and reviewed the evidence, and considered the arguments of the parties thereon; and having this day entered its *Memorandum of Decision on Objection to Discharge*, in accordance with which it is hereby

**ORDERED** that judgment shall enter in favor of the Plaintiff. The discharge of the Debtor–Defendant is **DENIED** under the authority of 11 U.S.C. § 727(a)(2)(A).

---

without objection. Thus the Complaint is deemed amended to conform to such evidence as provided by Bankruptcy Rule 7015 (making Fed.R.Civ.P. 15(b) applicable to bankruptcy adversary proceedings).

10. Frank's receipt of assets in lieu of wages was not reported to the IRS by the Corporation in its W–2 statements, in apparent violation of federal law.