In re Bruce KLUTCHKO, Debtor.

Marcy Baron, Plaintiff,

v.

Bruce Klutchko, Defendant.

Richard O'Connell, as Chapter 7 Trustee of Bruce Klutchko, Plaintiff,

v.

Bruce Klutchko, Defendant.

Richard O'Connell, as Chapter 7 Trustee of Bruce Klutchko, Plaintiff,

v.

Nathawan Sudbanthad and Sun River International, Ltd., Defendants.

Bankruptcy No. 01–41244(RDD). Adversary Nos. 03–02124 (RDD), 03–08033(RDD), 03–8060A (RDD).

United States Bankruptcy Court, S.D. New York.

Oct. 11, 2005.

557

Samuel E. Kramer, New York City, for plaintiff, Richard E. O'Connell, Chapter 7 Trustee.

David J. Weiss, for plaintiff, Marcy Baron.

Carlos J. Cuevas, Jamaica, NY, Wayne M. Greenwald, New York City, for defendants Bruce Klutchko, Nathawan Sudbanthad, and Sun River International, Ltd.

*MEMORANDUM OPINION AND ORDER DENYING DEBTOR'S DISCHARGE AND DENYING, IN PART, AND GRANTING, IN PART, FRAUDULENT TRANSFER CLAIMS*

ROBERT D. DRAIN, Bankruptcy Judge.

In the first two of the above-captioned adversary proceedings, plaintiffs Marcy Baron ("MB"), the estranged wife of the debtor ("BSK" or the "Debtor"), and the chapter 7 trustee (the "Trustee") seek denial of the Debtor's discharge under 11 U.S.C. §§ 727(a)(2)(A), (a)(3), (a)(4)(A), and (a)(5). In the third proceeding, which shares common facts, the Trustee seeks to avoid alleged transfers by BSK to Nathawan Sudbanthad ("NS"), with whom BSK has lived for several years, and to Sun River International, Ltd. ("Sun River"), a corporation wholly owned by NS, under 11 U.S.C. §§ 544 and 548 as intentionally or constructively fraudulent.

The Court conducted a bench trial and reviewed the parties' proposed findings of fact and conclusions of law, the trial transcripts and the exhibits. Based on the foregoing, including the demeanor and credibility of the witnesses, the Debtor's discharge should be denied under 11 U.S.C. §§ 727(a)(2)(A), (a)(3) and (a)(4)(A).[1] In addition, the Trustee has sustained his burden of proving the intentional fraudulent transfer to Sun River

---

1. Given the foregoing, there is no need to consider the applicability of 11 U.S.C.

§ 727(a)(5).

under 11 U.S.C. §§ 544 and 548 of certain funds received under a contract with Deloitte & Touche, but not otherwise.[2]

### Jurisdiction

This Court has jurisdiction over these adversary proceedings under 28 U.S.C. § 1334(b). These are core proceedings under 28 U.S.C. §§ 157(b)(2)(A), (H) and (J). Venue is proper under 28 U.S.C. § 1409(a).

### Facts

The Debtor's chapter 7 case, which commenced on April 30, 2001, grows out of his divorce case with MB, which has been pending since March 2, 1993 (P.Ex. 1). On October 6, 1995, MB obtained a $47,000 child support judgment against BSK (P.Ex. 1), which remains unsatisfied, although BSK has made clear that he intends to continue to contest it and other adverse rulings in the divorce case. A 1997 order in the divorce case also required BSK to pay support to MB of $9,100 a month; he failed to comply (10/18 Tr. 133, 134, 161–162). Starting in June 2001, BSK's support obligations were scaled back to the more manageable amount of $750 a month, which, however,

he has not satisfied since at least the end of 2002 (10/18 Tr. 160).

Most of the other claims against the Debtor also appear to relate to the divorce case. The largest claims against BSK's estate are approximately $110,000 scheduled as owing to various matrimonial attorneys (P.Ex. 54).[3] In addition, the Debtor's schedules list $58,599.28 owed on several credit cards (*id.*); the credit card issuers have not contested either the Debtor's discharge or the dischargeability of their respective claims, however, and these debts were barely addressed at trial.

BSK's matrimonial troubles also affected his ability to earn a living. He was once a practicing psychiatrist. However, largely as a result of the efforts of MB's matrimonial lawyers (10/18 Tr. 126, 127), a professional disciplinary complaint was lodged against BSK in 1996, the prosecution of which led, first, to BSK's loss of patient referrals and, ultimately, to his agreement in November 1997 to surrender his medical license (P.Ex. 2; 9/29 Tr. 8–10; 10/18 Tr. 131–132). At that point, his practice ceased, although by then it had already withered because of the marital breakup's effect on his emotional and physical health and the taint raised by the disciplinary proceeding (10/18 Tr. 125–126, 128).[4]

---

**2.** This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law under Bankruptcy Rule 7052.

**3.** Testimony at the trial also revealed that after BSK's mother died, one of BSK's matrimonial attorneys obtained the deed to BSK's father's house, apparently to satisfy BSK's legal fees or as some form of retainer (10/18 Tr. 172–175). BSK's father died during the course of this adversary proceeding. The allowance of this attorney's claim in the Debtor's chapter 7 case, including whether the assignment complied with applicable law (*see, e.g.,* N.Y. C.R.R. §§ 1400.3, 1400.5(a)), has yet to be addressed.

**4.** In the light of MB's role in impairing BSK's ability to earn a living (although, of course,

BSK bore responsibility for the actions that led to the surrender of his license), it is, to say the least, ironic that MB has so actively sought the denial of BSK's discharge. Given the rights uniquely conferred on her and the couple's child under sections 523(a)(5) and (a)(15) of the Bankruptcy Code, MB's pursuit of relief for the benefit of all of BSK's creditors under section 727(a) of the Bankruptcy Code also may be driven by considerations beyond economic self-interest. However, the fact that the relief sought here *is* for all creditors' benefit argues against applying any equitable defenses against MB in the section 727(a) proceedings. *See Mondore v. Mondore* (*In re Mondore*), 326 B.R. 214, 219 (Bankr. W.D.N.Y.2005).

Fortunately for BSK, however, in the spring of 1996 he started to live with NS, a pharmacist employed at a hospital (9/29 Tr. 6); they have two children (P.Ex. 35; 10/18 Tr. 70). Upon discovering that the Debtor had concealed the full nature and extent of his dealings with Sun River and had not disclosed certain income in his bankruptcy schedules (see below), the Trustee became concerned that BSK may have transferred substantial sums over the years to NS, either directly or through Sun River. Certain large prepetition deposits into NS's and Sun River's bank accounts and NS's purchase of the couple's condominium seemed to support that suspicion.

The facts presented at the trial revealed a somewhat different picture. Based on the testimony of NS and BSK, in addition to a review of their bank records, it does not appear that BSK had enough income between 1996 and the petition date to have made such large transfers to Sun River or NS. Instead, the net increases to NS's and Sun River's bank balances during the prepetition period were almost entirely attributable to NS's own borrowing and the liquidation of her savings plan. From such funds and her salary and other savings, she has been the primary financial support for BSK and their children, including purchasing the condominium in which they live (9/29 Tr. 77; 10/1 Tr. 23; 10/18 Tr. 45–46).

Nevertheless, BSK did receive some income during the reach-back period covered by the applicable fraudulent transfer statutes, which, if not paid to matrimonial lawyers or as court-ordered matrimonial and/or child support, he apparently applied to the living expenses of his new family

(9/29 Tr. 43, 86–87; 10/1 Tr. 168, 169, 235–236; 10/18 Tr. 89–90, 107–108).

As the trial progressed, it became clear that such payments, were not, however, the primary basis asserted for the denial of BSK's discharge and for the Trustee's fraudulent transfer claims. Instead, the plaintiffs focused on the allegation that BSK and NS created and used Sun River to hide from BSK's creditors, chiefly MB, the income that he managed to generate, and, relatedly, that BSK failed to disclose the nature of his relationship with Sun River to the Trustee. In particular, plaintiffs allege that when BSK eventually obtained meaningful employment, years after he stopped practicing psychiatry and shortly before the petition date, he caused it to be documented through the straw man of Sun River so that MB would not learn of it and attach his wages. Then, they allege, BSK misled the Trustee into believing that BSK was working for Sun River, a shaky start-up venture, when, in fact, he had a more lucrative and stable job, under contract with a "Big Four" accounting firm. The plaintiffs also allege that BSK's use of Sun River in this manner was part of a pattern of concealing his income.

The defendants have responded, in part, by trying to show that Sun River was a bona fide entity, established for a valid business purpose, which NS and BSK consistently testified was to develop the export and import of nutritional and pharmaceutical products to and from Asia (9/29 Tr. 49–50; 10/1 Tr. 221–222; 10/18 Tr. 188–189).[5] They also contend that BSK's other questionable actions, discussed below, were not part of a pattern and, in any event, were excusable.

---

5. Sun River's corporate tax returns also stated from December 31, 1997 through September 30, 2002 that the company's business

consisted of the export/import of such products (P.Ex. 7, 10, 15, 20, 25).

Although Sun River never made any money in its stated export/import business, and the timing of its incorporation one month before BSK surrendered his medical license raises suspicions that the defendants intended to use Sun River to shield any future income that BSK might earn, there is some basis for the defendants' contentions. NS, who always has been Sun River's sole shareholder (P.Ex. 7, 10, 15, 20, 23), received advice from not-for-profit small business development experts (10/1 Tr. 16–17, 27), prepared marketing materials on pharmaceutical products (10/1 Tr. 40), involved Sun River in two trade visits to China (undertaken by BSK) (10/1 Tr. 25–27, 38–39), and engaged (through BSK) in negotiations with one or two parties about establishing joint ventures or development projects in China (10/1 Tr. 42–45). Therefore, although NS does not appear to have kept much capital in Sun River and, as discussed below, caused Sun River to take highly questionable tax deductions for what appear to have been NS and BSK's ordinary living expenses, Sun River, does not appear to have been an utter sham.

However, whether Sun River was in some respects a bona fide business, an issue that I do not reach, the defendants have largely ignored the more relevant issue: the nature of BSK's relationship with Sun River and his lack of disclosure regarding that relationship, especially whether, as plaintiffs contend, the only time Sun River made any money was when it served as a corporate front for work done by BSK that was wholly unrelated to Sun River's stated business purpose. A review of the facts as they pertain to that issue shows that BSK and NS indeed used Sun River to conceal BSK's financial condition, especially BSK's sources of income, from, among others, MB and her attorneys, taxing authorities and the Trustee. It appears, moreover, that this obfuscation was part of a pattern to hide BSK's income, such as it was, at least from MB.

For the first three years after BSK surrendered his medical license, his income was sporadic. BSK had no regular job, and his income-producing activities were confined to the following. In late 1997 and during 1998 BSK received at least $35,000, and, perhaps many thousands of dollars more, in respect of patient accounts receivable generated before, but paid after, his psychiatric practice ended (P.Ex. 44, 10/1 Tr. 136, 234). Second, between at least May 1998 and November 1999 he sublet his former professional office suite at a slight profit (P.Ex. 5; 9/29 Tr. at 23, 25, 26, 27, 28, 29). For brief periods during these years, BSK also performed some services, mostly manual labor, for a carpet selling business in which a relative of NS was involved (P.Ex. 68; 9/29 Tr. 90, 110; 10/1 Tr. 33); he assisted in putting together a business plan for a company that wanted to project people's names on lasers into outer space (10/1 Tr. 19–20); and he provided a small amount of research assistance to one of his matrimonial attorneys in an unrelated matter for a nominal sum (P.Ex. 13, 14; 9/29 Tr. 105–108).

Most, if not all, of the receivables collected by BSK, the profit from the office sublease, and the money earned on the carpet, laser and legal projects apparently went to pay the living expenses of BSK, NS and their children, as well as BSK's legal fees, but, as noted above, NS has consistently contributed more financially to their household, including their children's support (9/29 Tr. 46–47; 10/1 Tr. 12, 60). Evidence was lacking that BSK secreted the money or used it for investment or luxury purposes or toward the purchase of the couple's condominium. Perhaps because of this fact, the Trustee does not continue to press for the avoidance of such

payments as fraudulent transfers. *See, e.g. In re Lee,* 51 F.2d 394, 395 (D.Ga. 1931); *Rutland v. Petersen (In re Petersen),* 323 B.R. 512, 521 (Bankr.N.D.Fla. 2005); *see also Matter of Donna R. v. Robert P.,* 209 A.D.2d 623, 619 N.Y.S.2d 131 (2d Dep't 1994) (confirming child support obligation).[6] The plaintiffs have, however, highlighted aspects of the foregoing activities to show a pattern supporting their contention that BSK's discharge should be denied.

For example, the work that BSK did for his matrimonial attorney, in the carpet business and for the laser project, which, together, generated a few thousand dollars of income, was conducted in the name of Sun River although those projects had no relation to Sun River's stated business purpose. Indeed, NS testified that the purpose of those projects was first and foremost to give BSK something to do (10/18 Tr. 75; 10/1 Tr. 11). No bona fide business reason was offered why BSK undertook the projects under Sun River's name rather than his own and why the payments were made to Sun River and not to BSK.

BSK and NS also treated Sun River, not BSK, as the purported sublessor of BSK's former medical suite, although there does not appear to be any record of an assignment of the office lease from BSK to Sun River nor of any payment by Sun River to BSK for such an assignment, and BSK, not Sun River, apparently paid the rent on the prime lease (9/29 Tr. 71–79). Nevertheless, the sublessee paid its rent to Sun River. Again, no valid business reason was offered for Sun River's insertion as the sublessor to receive this money.

In addition, the office sublease and certain of BSK's and NS's household expenses, such as their car and parking garage (which BSK paid, at least while he was collecting patient accounts receivable (9/29 Tr. 47; 10/1 Tr. 161–163, 10/18 Tr. 93–98, 107–108)), as well as their home telephone and other bills, were run through, and expensed on the tax returns of, Sun River (9/29 Tr. 46–47, 115–127). That is, BSK and NS used Sun River to pay their personal bills, although this was not a legitimate business purpose of Sun River. Instead, it appears that Sun River was again used to mask the fact that BSK was paying some of his bills with his own, rather than NS's, money.

The plaintiffs also note that BSK appears to have tried to keep secret his income from the collection of patient accounts receivable after the surrender of his license. He did not file tax returns for 1996 through 1998 until January 2000 (10/18 Tr. 17). At that time, he did not report the collection of the accounts receivable as income on his 1997 and 1998 returns, failing to correct that omission until the plaintiffs pointed it out during a deposition in these adversary proceedings (P.Ex. 44; 10/18 Tr. 25–26), after which he amended the 1998 return.

BSK also has no records of these patient accounts receivable with the exception of cancelled checks received. He contends that he kept his medical practice's records on an "ancient" computer in his office that crashed during 1998 (10/18 Tr. 49); furthermore, he contends that someone stole his computer's hard drive from his office (10/1 Tr. 147). Neither assertion stands up. BSK is well-educated and sophisticated; it is reasonable to assume that his medical practice, in which various forms of insurance played an important role and his patients had rights in respect of their billing records, required better record keeping. Moreover, BSK acknowledged that

---

**6.** BSK had such an obligation during this period (10/1 Tr. 60).

he cannot explain how someone could have entered his office suite (which was protected by a security system) to steal his supposedly inoperative hard drive; he never filed a police report about the purported theft; and in the divorce case he testified, to the contrary, that his office records still existed (P.Ex. 45; 10/1 Tr. 142–145).[7]

BSK's employment prospects began to improve in the summer of 2000. Between August, 2000 and January, 2001, BSK worked in an unspecified capacity for Aramark Educational Resources ("Aramark"), earning a total of $19,253.28 (10/1 Tr. 18). Upon discovering the existence of this job, which was not booked through Sun River, but, rather, held directly by BSK, MB promptly obtained an income attachment (P.Ex. 57; 10/1 Tr. 189–190). Shortly thereafter, BSK's employment at Aramark terminated for unspecified reasons (10/1 Tr. 190).[8]

Then, starting on February 1, 2001 BSK went to work at the accounting firm Deloitte & Touche ("D & T"), preparing personality profiles (9/27 Tr. 39, 48; P.Ex. 19). From the start, BSK's work at D & T was governed by an agreement, dated February 1, 2001 (the "D & T Contract") (P.Ex. 19). Notwithstanding this contract, BSK's employment at D & T was at first performed on a somewhat piecemeal basis (9/27 Tr. 46), for which he was paid by the hour (9/27 Tr. 37).

It is not entirely clear how much money D & T paid for BSK's approximately three months of work before the start of the chapter 7 case. NS testified that Sun River received only one prepetition check

from D & T, for $4,581.25, on March 28, 2001 (10/1 Tr. 118–119), but she also testified that she did not know when BSK filed for bankruptcy (id.), and BSK testified that Sun River received two checks from D & T before the filing of his bankruptcy petition (10/18 Tr. 204–205). It appears, however, that he received approximately $2,500 a month for the three months of piecemeal prepetition work.

After D & T's offices were destroyed on September 11, 2001, D & T started to give BSK more work on a more regular basis, for which he was paid $1,500 per week (9/27 Tr. 38; 10/1 Tr. 54; P.Ex. 19). BSK's work at D & T continued until the D & T Contract was terminated in October 2003 under an agreement (the "Termination Agreement") pursuant to which D & T made a $18,000 lump sum payment that was in addition to any accrued wages (P.Ex. 63; 10/18 Tr. 206). In the aggregate, therefore, D & T paid approximately $190,00 for the work under the D & T Contract (9/29 Tr. 38, 62, 66–67; P.Ex. 20, 23), plus the $18,000 termination payment, for a total of $208,000, no small sum. Most, by far, of the amounts paid by D & T were for services performed postpetition.

The Termination Agreement does not state a reason for the $18,000 termination payment. BSK testified that the termination payment was not intended to settle any cause of action (10/18 Tr. 206). A D & T partner explained that D & T's human resources and legal departments routinely drafted such termination agreements in accordance with the firm's policies for ter-

---

7. On the other hand, the Trustee at least has a fairly good idea of the amount of accounts receivable that actually were paid to BSK, because BSK produced his bank records in addition to the canceled checks. (10/18 Tr. 149).

8. Except for garnished funds, including a stipulated garnishment by BSK's father, intended to reimburse his father for the payment of some of BSK's legal bills, it appears that BSK's Aramark earnings went to pay BSK's matrimonial attorneys and his and NS's living expenses.

minating consulting arrangements (9/27 Tr. 29–31). Based on this testimony, an inference should be drawn that the payment was in the nature of severance that was not tied to any particular length of service but simply to the termination of employment, which, as the testimony made clear, involved access by BSK to sensitive and confidential D & T information.

Although NS may have at times assisted BSK, such as by conducting some computer research, she testified that BSK did at least 80 percent of the work for D & T (10/1 Tr. 54; 9/29 Tr. 127–128). It is unlikely that NS provided even as much as 20 percent assistance. D & T was clearly looking to BSK, not NS, to perform the consulting services.[9]

BSK's employment with D & T, like his other employment discussed above, with the exception of his work for Aramark that ended soon after MB's garnishment of his Aramark wages, was not documented directly between *BSK* and D & T but, rather, between *Sun River* and D & T. Sun River was the party to the D & T Contract, although BSK, as "General Manager" (as well as NS, as "President") signed the D & T Contract on behalf of Sun River (P.Ex. 19). The Termination Agreement also was between D & T and Sun River, with BSK, signing individually and NS signing individually and on behalf of Sun River (P.Ex. 63). D & T made all of the payments under the D & T Contract and the Termination Agreement to Sun River, not to BSK.

Neither MB nor the Trustee learned of BSK's work at D & T until well after the April 30, 2001 petition date.

In his Statement of Financial Affairs and bankruptcy schedules as well as when examined under oath by the Trustee at his July 11, 2001 meeting under section 341 of the Bankruptcy Code, BSK described himself as an employee of Sun River, not of D & T.

Moreover, neither in his Statement of Financial Affairs, nor in the schedules filed in his chapter 7 case (P.Ex. 54; 10/18 Tr. 202–203), nor when questioned under oath by the Trustee did BSK reveal even that *Sun River* was receiving income because of his services to D & T. Indeed, BSK gave the Trustee a very different description, under oath at his meeting under section 341 of the Bankruptcy Code, of the business of Sun River, his role in that business and his source of income:

The Trustee: Now are you working?

BSK: Yes, I am.

The Trustee: What do you do?

BSK: Well, I work for Sun River, which is a company that [NS] started, and we primarily sell nutritional supplements overseas, and we have been doing it for several years. We final—we can sell it to other companies and stuff and we finally got our first clients, and I'll be getting income.... Yeah, and I have just started working now again, so I had a job last year that they ended my line, it was a temporary job. So I just got, you know, as of June 1, I got my insurance and I'm back with Sun River, so—.

(P.Ex. 59, 29–30).[10] At the section 341 meeting, BSK also responded as follows to

**9.** Representatives of D & T testified that they dealt only with BSK, who was frequently at D & T's offices. They acknowledged, however, that they had no way of verifying how much of the work performed under the D & T Contract was done off-site, or, because of special D & T encryption software, whether

other people, such as NS, could have performed work in addition to work that they assumed BSK performed (9/27 Tr. 28, 32, 49–50).

**10.** The Debtor's Statement of Financial Affairs disclosed only that Sun River paid BSK a monthly "consulting fee" of "$2,500, $1,750

MB's counsel's inquiry about what he was doing for Sun River: "All sorts of things. I write letters. I do research. I meet people. I traveled when [NS] was pregnant, things like that." (P.Ex. 59, 36).

Two observations should be made about this testimony.

First, it clearly was misleading. Like most of BSK's other "work for Sun River" (and all of Sun River's income-producing activities), and contrary to BSK's statements to the Trustee, BSK's work at D & T was not "sell[ing] nutritional supplements overseas." [11] Instead, BSK kept the Trustee in the dark about the fact of his work for D & T; it was revealed only later, accidentally, when MB noticed a D & T caller identification number as the source of a telephone call from BSK (10/1 Tr. 247–248).

Second, BSK testified at the trial that he knew that documenting the D & T work as Sun River work was an artifice, adopted, he contended, to make it easier for D & T to hire him:

> BSK: What he [a D & T representative] said to me was that [D & T] has some sort of questionnaire that determines whether an individual is a consultant or an employee. If you do not meet the requirements of a consultant, you are an employee and they were not hiring employees.

He said but if you have a company then maybe you can do it that way, and I said to him, I don't have a company and I don't know that I have the wherewithal to just set one up right now but I've been working for [NS's] company and we have done some consulting and I said would that qualify. And he said yes, and then he said he had a company that was consulting and that should work out fine.

I was then asked to come back a couple of weeks later and handed a contract by some administrative person, young woman whose name I don't recall, and I said to her, well, you know, it is not filled out.

She said if you want to work here just fill out your part and we will take care of the rest and so I brought it home to [NS] and said, look, you know, I want to start earning some money. I've got too many bills to pay. I've got to do something. This may not be what we are looking for but it is short term. This could be the start of something and maybe the beginning of getting us back on track. It will bring in some money. So my recommendation is that you take care of the signing and let me do some work.

Q: What was your intent of having Sun River be engaged in the consulting contract with D & T?

net" (P.Ex. 54; 10/1 Tr. 194), which contradicted NS's testimony at the trial that eight months after BSK filed under chapter 7, she caused Sun River, on the advice of counsel and an accountant, to start to pay BSK a salary of $38,000.00 per year (9/29 Tr. 126–127; 10/1 Tr. 56–57). She determined this amount based on the amount she calculated remained in Sun River after paying other expenses of Sun River (9/29 Tr. 128), including her own Sun River salary (10/1 Tr. 56). In any event, in the context of BSK's testimony at the section 341 meeting, the statement about his income from Sun River in his

schedules contributed to misleading the Trustee rather than informing him.

11. It is worth repeating that since Sun River's inception, its only income was obtained from the D & T Contract and the Termination Agreement, the sublease of BSK's office suite, and the three discrete projects undertaken by BSK discussed above, all attributable to BSK's work and not related to Sun River's stated business purpose. BSK acknowledged that Sun River never sold any pharmaceuticals, vitamins, or nutritional or other products in Asia or elsewhere (10/18 Tr. 189).

BSK: The intent was simply to get the consulting contract, to get the engagement so that we could then bring in some funds.

(10/18 Tr. 156–158). Thus BSK acknowledged that, at least for the purpose of helping him to secure a job with D & T, Sun River was merely a front. In that light, it is telling that BSK so clearly went out of his way in his testimony at the section 341 meeting to omit any discussion of D & T and to lead the Trustee to believe that the income generated by him for and through Sun River was for Sun River's start-up export/import business.[12]

Where did the D & T money go? The only testimony in any detail on this subject, by NS, was contradictory. At one point she seemed to be so determined to establish Sun River's independence from BSK that she denied that the money received by Sun River on account of BSK's work did not benefit BSK's creditors, directly or indirectly (10/1 Tr. 116–117; 119). NS testified, to the contrary, that the money received by Sun River was used to benefit Sun River and NS as its shareholder:

Q: Now, when you look at Exhibit 128 and you look at the debits, they include things like the car and garage space, as well as insurance, [did] any of those things that Sun River was paying involve paying creditors of [BSK]?

NS: No, sir. I didn't think that I would be—I would have to pay for BSK's creditors. He and I live separate lives.

(10/1 Tr., 117). Notwithstanding the last sentence of this testimony, however, it is quite clear that NS and BSK did *not* live separate lives; indeed, immediately after the foregoing testimony NS testified, "All I know is that he doesn't have money and all I know is that I always work and pay for the bills." (*Id.*). And both NS and BSK apparently believed that they could use the D & T money, paid to Sun River, for their household expenses (and for BSK's attorneys), such as making car, garage and telephone payments.[13] Focusing on the relatively small amount paid by D & T for the two months of prepetition services, there was no evidence that the defendants secreted this amount or used it for any other purpose than to pay ordinary household bills and BSK's lawyers. The plaintiffs have not contended that the money was used for another purpose. The Court does not accept, however, that the $18,000 lump sum payment was used simply for their reasonable household expenses. There was no testimony on this subject.

When the D & T Contract came to light, the Trustee naturally suspected that BSK might have misrepresented or omitted to disclose other information or transfers. As noted above, this does not appear to

---

**12.** I do not determine whether, in fact, documenting the employment relationship as being with Sun River facilitated D & T's hiring of BSK, as BSK and NS contended. The trial testimony by D & T representatives on this point was inconclusive. Ultimately, however, that determination is of little relevance to the issues raised by these proceedings. Even accepting BSK and NS's contention that BSK documented the job through Sun River to make it easier for D & T to hire him (in fact, in the light of that contention), BSK misled the Trustee about the nature of his income and prospects.

**13.** It also is worth noting that, notwithstanding the testimony quoted above, NS testified that a portion of the money earned from D & T was used to pay insurance and child support for BSK and MB's son until January 2002, when BSK started to make such payments himself with his "consulting fee" from Sun River (10/18 Tr. 83–88, 101–102), which he continued until his attorneys and he adopted a different strategy in the divorce case (10/18 Tr. 161).

have been the case, with the exceptions that (a) BSK's Statement of Financial Affairs, consistent with his original understatement of his income for tax purposes, understated his income for 1998, and (b) the Statement of Financial Affairs also omitted BSK's and NS's joint account at Independent Savings Bank (P.Ex. 54; 10/1 Tr. 165, 178), which, however, BSK does not appear to have used much. Following initial discovery taken by the Trustee and MB, the defendants retained an expert to examine their financial records (and, where such records were lacking, summaries prepared by the defendants). At trial the defendants' expert testified that, based on his analysis, all but 2% to 3% of BSK and NS's transactions could be accounted for (10/18 Tr. at 49) and were innocuous. Because of the expert's reliance on summaries prepared by the defendants, I do not find that his conclusion should be accorded any real weight, however, and rely more on the plaintiffs' inability, after extensive discovery, to point to any particular material transaction that has not already been discussed. By then, however, BSK's initial failures of disclosure obviously had caused the Trustee to undertake a lengthy and costly discovery process to try to obtain an accurate picture of BSK and NS's financial situation and a better sense of whether BSK was hiding any other information, such as other sources of income or transfers.

BSK and NS also offered non-expert testimony regarding BSK's mental and physical condition starting in 1996 (10/18 Tr. 138–145) to justify BSK's disclosure omissions and errors. The Court accepts that after his separation from MB and for a few years thereafter BSK was more or less dysfunctional and unable to obtain or retain a job and (*id.*). However, by the time BSK commenced his chapter 7 case he was able to function responsibly, as evidenced by, among other things, his work for Aramark and D & T, and he knew the difference between filling out a bankruptcy schedule correctly or responding forthrightly to the Trustee's questions and doing so in a misleading way (10/18 Tr. 185).[14]

The Court gives less weight to three other allegations that BSK misled the Trustee and creditors.

First, the Trustee and MB contend that BSK's schedules were deficient in not listing BSK's August 10, 2000 confession of an $85,000 judgment to his father in connection with a $85,000 in loans, the proceeds of which were used to pay BSK's counsel in the matrimonial litigation, or a related consensual garnishment by his father of BSK's Aramark earnings (P.Ex. 54, 56; 10/1 Tr. 187, 214, 215). Although the judgment and garnishment were not listed in the proper sections of BSK's schedules, BSK disclosed the obligation to his father elsewhere in his schedules as an unsecured claim (P.Ex. 54; 10/18 145), and it is understandable that BSK would not think to describe the confession of judgment as a "litigation" (1/18 Tr. 145).[15]

Second, plaintiffs contend that BSK did not reveal in his schedules that he had an ownership interest in Sun River or that he was an officer or director of the company. The problem with this contention as a basis for denying the discharge that is separate from the basis of BSK's misuse of

---

**14.** BSK is highly educated, having graduated with honors in physics from a prestigious college and having practiced for nineteen years as a psychiatrist (10.18 Tr. 110, 136).

**15.** On the other hand, the fact that this collusive confession of judgment was entered after BSK started to work at Aramark but before MB discovered that job again leads to the inference that BSK engaged in a pattern to protect his assets from MB.

Sun River's corporate form to hide his income, is that it is factually incorrect. NS owned all of Sun River's stock, and BSK did not serve on its board and had no formal role as an officer (although sometimes he was designated its "General Manager") (P.Ex. 58; 9/29 Tr. 129; 10/1 Tr. 228–229).

Finally, although BSK's bankruptcy disclosure did not list his ownership of the professional corporation, Bruce Klutchko, P.C., under which he had practiced medicine, this omission is explained by the fact that the corporation was precluded from such practice after he surrendered his medical license, and, reasonably believing the P.C. to be defunct, BSK can be excused from disclosing that he continued to own it (10/18 Tr. 149).

## Discussion

■■■ I.A. *Denial of Discharge under 11 U.S.C. § 727(a)(4)(a).* Section 727(a)(4)(A) of the Bankruptcy Code provides that "The court shall grant the debtor a discharge, unless the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account." 11 U.S.C. § 727(a)(4)(A). "It is well established that to prove an objection to discharge under § 727(a)(4)(A), the creditor must prove the following by a preponderance of the evidence: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Carlucci & Legum v. Murray (In re Murray)*, 249 B.R. 223, 228 (E.D.N.Y.2000). Fraudulent intent must be shown by actual, not constructive fraud, although a "reckless indifference to the truth" also suffices. *Id.*, citing *Diorio v. Kreisler–Borg Constr. Co. (In re Diorio)*, 407 F.2d 1330, 1331 (2d Cir.1969). *See also In re Mondore,* 326 B.R. at 216 (noting, further, that "[T]he required false oath or account may be a false statement or omission in the debtor's schedules or a false statement by the debtor at an examination at a creditor's meeting [under Bankruptcy Code section 341].").

■■■ Although the objector to a debtor's discharge bears the ultimate burden of proof, by a preponderance of the evidence, Bankruptcy Rule 4005; *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Corning Vitro Corp. v. Shah (In re Shah)*, 169 B.R. 17, 20 (Bankr. E.D.N.Y.1994), the objector may present a sufficient prima facie case on certain aspects of the question to place the burden on the debtor to come forward with contrary evidence. "[T]he rule leaves to the courts the formulation of rules governing the shift of the burden of going forward with the evidence in the light of considerations such as the difficulty of proving the nonexistence of fact and of establishing a fact as to which the evidence is likely to be more accessible to the debtor than to the objector." Advisory Committee Notes to Bankruptcy Rule 4005. In litigation under section 727(a)(4)(A), "Where it reasonably appears that the oath is false, the burden falls upon the debtor to come forward with evidence to prove that it was not an intentional misrepresentation. If the debtor fails to provide such evidence or a credible explanation for his failure to do so, a court may infer fraudulent intent." *In re Murray,* 249 B.R. at 228 (internal quotations and citations omitted); *see also Mick v. Bricker (In re Mick)*, 310 B.R. 255, 258 (D.Vt.2004); *In re Shah,* 169 B.R. at 20.

■■■ Three other principles are also relevant. First, the provisions of Bankruptcy Code section 727(a) should be "construed liberally in favor of the debtor and strictly against the creditor. Courts have

noted that a total bar to discharge is an extreme penalty. The reasons for denial of a discharge must be real and substantial rather than technical and conjectural." 6 *Collier on Bankruptcy* ¶ 727.01[4] (15 ed.2005) at 727–12 (internal quotations omitted); *see also State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir.1996); *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir.1993); *Commerce Bank v. Burgess (In re Burgess)*, 955 F.2d 134, 137 (1st Cir.1992).

■ Second, consistent with, but tempering, the foregoing, a discharge is a privilege accorded only to the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. at 286–87, 111 S.Ct. 654; *In re Robinson*, 506 F.2d 1184, 1188 (2d Cir. 1974).

■ Finally, notwithstanding the policy in favor of the discharge, a debtor's obligation to provide accurate disclosure should not be minimized. "The purpose behind 11 U.S.C. § 727(a)(4) is to enforce debtors' duty of disclosure and to ensure that the debtor provides reliable information to those who have an interest in the administration of the estate. Bankruptcy Trustees lack the time and resources to play detective and uncover all the assets and transactions of their debtors." *In re Murray*, 249 B.R. at 230 (internal quotations and citations omitted). Thus, omitted or incorrect information may be "material" for purposes of section 727(a)(4)(A) even if ultimately the failure to disclose was not prejudicial to creditors. *Id.* A statement is "material" for purposes of section 727(a)(4)(A) simply if it is pertinent to the discovery of assets, and a "material" matter is one bearing a relationship to the debtor's business, transactions or estate which might lead to the discovery of assets, business dealings, or the existence or

disposition of the debtor's property. *In re Mick*, 310 B.R. at 261; *In re Murray*, 249 B.R. at 230–32; *Congress Talcott Corp. v. Sicari (In re Sicari)*, 187 B.R. 861, 881–82 (Bankr.S.D.N.Y.1994); *In re Shah*, 169 B.R. at 21. *See generally In re Robinson*, 506 F.2d at 1188.

■ Thus, the statute will not be applied to the debtor's detriment if the debtor's omission or error resulted from an inadvertent or honest mistake, that is, where an honest debtor would reasonably have assumed that the particular piece of information at issue was not addressed by the disclosure requirement. *In re Murray*, 249 B.R. at 232; *In re Mondore*, 326 B.R. at 216. *See also In re Gugliada*, 20 B.R. 524, 528 (Bankr.S.D.N.Y.1982) ("Manifestly, an average debtor might reasonably believe that the stock [of a long-inactive corporation] was of no value and therefore forget to mention it in the schedules."). Generally, however, "It is not for the debtor to determine which assets should be disclosed to his creditors." *Id.* The "[debtor's] duty is merely to answer truthfully. It is left to the creditors or parties-in-interest to judge whether that information will aid them or prejudice them." *In re Shah*, 169 B.R. at 21; *see also In re Murray*, 249 B.R. at 231.

■ Based on the foregoing standard, several of the alleged bases for denial of BSK's discharge under section 727(a)(4)(A) are unavailing. The plaintiffs have not established either BSK's fraudulent intent with respect to, or the materiality of, his failure to disclose either his ownership interest in the defunct professional corporation pursuant to which he formerly practiced medicine, his nonexistent ownership interest in Sun River, or his confession of judgment to his father as a "litigation." [16] Further, section

---

**16.** Again, there was not a total failure of dis-

closure of this fact; BSK disclosed his fa-

727(a)(4)(A) is not the appropriate remedy for the potential problems with BSK's taxes. *See Rothman v. Beeber (In re Beeber)*, 239 B.R. 13, 28 (Bankr.E.D.N.Y.1999) (section 727(a)(4) does not apply to filing of false tax returns).

 On the other hand, BSK's testimony at the section 341 meeting regarding the source of his income, particularly in the context of the long course of dealing, described above, in which BSK hid or obscured his sources of income,[17] satisfies all of the elements of section 727(a)(4)(A). By avoiding any reference to D & T, the D & T Contract or the type of work that he was doing for D & T and, to the contrary, leading the Trustee reasonably to believe that he was working for Sun River, a start-up company hoping to sell nutritional products overseas, writing letters, doing research and meeting people (P.Ex. 59, 36), BSK knowingly mislead the Trustee, under oath.

The correct information that BSK should have provided about the source of his income also was "material" for purposes of section 727(a)(4)(A), because it related to his financial condition, business dealings and potential estate assets. For example, the Trustee might have considered whether BSK's prospects, in the light of the D & T relationship, were so favorable in comparison to his obligations, particularly given MB's possible rights under sections 523(a)(5) and (a)(5) of the Bankruptcy Code, to warrant moving to dismiss the chapter 7 case under 11 U.S.C. § 707(b). *See Montey Corp. v. Maletta*

*(In re Maletta)*, 159 B.R. 108, 115 (Bankr. D.Conn.1993). Second, if the Trustee had known that D & T employed BSK, in effect, rather than Sun River, the Trustee might have immediately pursued whether BSK's having caused D & T to enter into the D & T Contract with Sun River was a constructive or intentionally fraudulent transfer. Indeed, this is what subsequently occurred, and, as discussed below, there are, in fact, at least two sources of recovery for the estate at the end of such inquiry: (1) any obligations, such as for severance, exclusive of postpetition wages for BSK's services, that D & T might still owe as an employer, and (2) any payments by D & T to Sun River for prepetition services.

The testimony at the section 341 meeting also was made with actual fraudulent intent. BSK did not give the Trustee a straight answer; he gave the Trustee a misleading answer. *See In re Gugliada*, 20 B.R. at 524, in which the court found that any argument that omissions, similar to BSK's,[18] were inadvertent "would strain credulity;" to the contrary, especially in the light of a pattern of such concealment, such self-serving omissions established the fraudulent intent required by section 727(a)(4)(A). *Id.* at 533. Contrast *Robertson v. Swanson (In re Swanson)*, 36 B.R. 99, 100 (9th Cir. BAP 1984), in which the court denied an objection to discharge under section 727(a)(4)(A) based on the debtor's schedules' omission of his solo accounting practice as an asset, because (a) under 11 U.S.C. § 541(a)(6) postpetition earnings from such practice would not be

---

ther's claim elsewhere in his schedules.

**17.** *Individual disclosure errors or omissions,* which might appear innocuous when viewed in isolation, may be established by their context in a course of dealing to be intentionally fraudulent. *See In re Sicari,* 187 B.R. at 882 (fraudulent intent may be established by circumstantial evidence or by inferences drawn

from a course of conduct); *In re Gugliada,* 20 B.R. at 533.

**18.** In *Gugliada,* the debtor concealed the nature and extent of his equitable interest in a business nominally owned by his father. 20 B.R. at 533.

property of the estate,[19] and (b) the "Debtor *fully disclosed* his entire employment history including his previous accounting practice." (Emphasis added.) Thus in *Swanson,* unlike here, there was no false oath with intent to conceal.

The plaintiffs having satisfied all of the requirements of 11 U.S.C. § 727(a)(4)(A), the Debtor's discharge should be denied

■■■■ **B.** *Denial of Discharge under 11 U.S.C. § 727(a)(2).* Under section 727(a)(2) of the Bankruptcy Code, a debtor will be denied a discharge for (1) transferring or concealing, (2) with intent to hinder, delay or defraud a creditor or the trustee, (3) either (a) property of the debtor within one year before the petition date or (b) property of the estate after the filing of the petition. 11 U.S.C. § 727(a)(2).[20] "The plaintiff must establish an actual intent to hinder, defraud or delay; constructive fraudulent intent cannot be the basis for denial of discharge," under section 727(a)(2). *Glaser v. Glaser (In re Glaser),* 49 B.R. 1015, 1019 (S.D.N.Y.1985). "However, fraudulent intent may be established by circumstantial evidence or by inferences drawn from a course of conduct, because rarely does a debtor admit that he actually intended to defraud creditors." *Id.; see also Citrus & Chemical Bank v. Floyd (In re Floyd),* 322 B.R. 205, 210 (Bankr.M.D.Fla.2005).

■■■■ In the present context, there obviously is considerable overlap between the application of sections 727(a)(4)(A) and 727(a)(2). *See C & H Electrical v. Newell (In re Newell),* 321 B.R. 885, 892 (Bankr. N.D.Ohio 2005) ("[T]he standard necessary to support a finding of knowingly making a false statement with the intent to defraud is, for all practicable purposes, identical to the standard required to support a finding of fraudulent intent under § 727(a)(2)."). The Court has already found that BSK concealed the nature and circumstances of the D & T Contract with fraudulent intent. That false disclosure, or concealment, was made to the Trustee postpetition, satisfying the temporal requirement of section 727(a)(2)(B), assuming that the D & T Contract, and the postpetition money owed by D & T under it was "property of the estate." Moreover, Sun River entered into the D & T Contract on February 1, 2001, approximately two months before the petition date, which satisfies the temporal requirement of section 727(a)(2)(A), assuming that the D & T Contract and the prepetition money owed under it was "property of the debtor."

Whether the plaintiffs have established those remaining elements of 11 U.S.C. § 727(a)(2)(A) and (B), however, requires further analysis. That is, are Sun River's rights under the D & T Contract either "property of the debtor" or "property of the estate" for purposes of sections 727(a)(2)(A) and (B)?

---

**19.** 11 U.S.C. § 541(a)(6) states that the "estate is comprised of all of the following property, wherever located and by whomever held: ... (6) Proceeds, product, offspring, rents, or profits from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case."

**20.** 11 U.S.C. § 727(a)(2) states: "The court shall grant a debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
(A) property of the debtor, within one year before the date of the filing of the petition; or
(B) property of the estate, after the date of the filing of the petition."

Nominally, of course, Sun River's rights are not BSK's rights, suggesting that the D & T Contract and the payments under it do not qualify for purposes of sections 727(a)(2)(A) or (B). This distinction, however, has been found to be unavailing when the debtor is shown to have had an *equitable* interest in property held nominally by a third party. *The Cadle Co. v. Ogalin* (*In re Ogalin*), 303 B.R. 552, 557–58 (Bankr. D.Conn.2004); *Sacklow v. Vecchione* (*In re Vecchione*), 407 F.Supp. 609–619 (E.D.N.Y. 1976); *see also In re Gugliada*, 20 B.R. at 531–32. Such an equitable interest exists if the debtor has transferred title under suspicious circumstances (which, as previously noted, occurred here), such as after a debtor has suffered a money judgment or otherwise is under financial pressure, but nevertheless retains attributes of beneficial ownership. *In re Ogalin*, 303 B.R. at 557–58; *In re Vecchione*, 407 F.Supp. at 618–19. Thus numerous courts have found that debtors who transferred all of their salary, or their right to receive salary, to a family member or to a corporation owned by a family member, yet retained the benefits of such salary, as here, should be denied a discharge. *Id.; In re Winik*, 39 F.Supp. 3 (D.N.J.1941); *Metropolitan Petroleum Co. v. Frumovitz* (*In re Frumovitz*), 10 B.R. 61, 65 (Bankr.S.D.Fla.1981); *see also Marine Midland Bank v. Portnoy* (*In re Portnoy*), 201 B.R. 685, 693 (Bankr. S.D.N.Y.1996).

Courts have declined to find such an equitable interest, and thus denied an objection under section 727(a)(2), however, in three circumstances. First, the discharge should not be denied if the debtor had a bona fide employment relationship with the insider employer. *See Old National Bank v. Reedy* (*In re Reedy*), 169 B.R. 28, 30 (Bankr.E.D.Va.1994), in which the debtor's wife established a corporation to more effectively manage her husband's consulting business. Significantly, however, it appears that the debtor in *Reedy* also fully disclosed the nature and extent of that arrangement. *Id.* Because BSK's employment circumstances were not similarly disclosed, and because Sun River was used to conceal BSK's income, not to manage it, *Reedy* is distinguishable.

Secondly, courts have denied discharge objections under section 727(a)(2) if the only transfers by the debtor to the spouse were used to pay reasonably necessary household expenses. *See, e.g., Bennett & Kahnweiler Assocs. v. Ratner* (*In re Ratner*), 132 B.R. 728, 733 (N.D.Ill.1991); *In re Glaser*, 49 B.R. at 1019. Although the rationale for such holdings is not always entirely clear, generally they are based either on the proposition that the payment of ordinary, reasonable household expenses does not hinder, delay or defraud creditors or on the closely related notion that the disclosure of the payment of such expenses is not required as not being material. The present case is distinguishable from the foregoing holdings, however. BSK did not pay to NS or cause D & T to pay to NS only such money as was reasonably required to support the couple and their children. He caused D & T to pay Sun River all of his salary (although it so happened, however, that his prepetition D & T wages were so small as to be used only for such expenses). Moreover, as noted above, the Court does not accept that the $18,000 termination payment was actually used solely for the household's reasonable living expenses, and I make no finding as to whether all of BSK's postpetition earnings were used for such expenses.

Lastly, courts have found that income fraudulently transferred or concealed was not "property of the debtor" or "property of the estate" under section 727(a)(2)(A) and (B), respectively, on the grounds that it was either (a) too contingent or exempt from being used to satisfy a money judg-

ment under applicable non-bankruptcy law, or (b) not property of the estate under section 541(a)(6) of the Bankruptcy Code. *See, e.g., Strane v. Schaeffer,* 87 F.2d 365, 366–67 (8th Cir.1937) (pledge of individual's future earning capacity to sister-in-law not an enforceable transfer of property); *In re Swanson,* 36 B.R. at 100 (postpetition personal services income not estate property under section 541(a)(6)). Here, some portion of the prepetition D & T payments was at least property in which BSK had an equitable interest. *See In re Portnoy,* 201 B.R. at 692–93 (in the light of N.Y. C.P.L.R. § 5205, which exempts only 90 percent of the earnings of a judgment debtor "except such part as a court determines to be unnecessary for the reasonable requirements of the judgment debtor and his dependents," the debtor was denied summary judgment under section 727(a)(2)). Moreover, the $18,000 termination payment was not postpetition personal services income for purposes of section 541(a)(6) of the Bankruptcy Code, excluded from the estate, but, rather, was incident to BSK's employment (including access to confidential D & T information) under the prepetition D & T Contract, as severance, and, moreover, apparently was not tied to any length of service. Therefore, the termination payment would not constitute income earned on account of BSK's postpetition services for purposes of section 541(a)(6) and thus would be property of the Debtor's estate. *See In re Ryerson,* 739 F.2d 1423, 1425–26 (9th Cir. 1984); *see also Venn v. Sherman (In re Sherman),* 322 B.R. 889, 892 n. 2 (Bankr. N.D.Fla.2004) (section 541(a)(6) does not exclude from estate earnings from postpe-

tition services *not* performed by the debtor).

Consequently, BSK's discharge also should be denied under 11 U.S.C. § 727(a)(2).

■■■■ *C. Denial of Discharge under 11 U.S.C. § 727(a)(3).* To prevail under section 727(a)(3) of the Bankruptcy Code, a plaintiff must establish that (1) the debtor failed to keep or preserve any recorded information, or destroyed or concealed it, (2) as a result, the debtor's financial condition cannot be ascertained, and (3) such failure was unjustified. 11 U.S.C. § 727(a)(3); [21] *In re Floyd,* 322 B.R. at 213; 6 *Collier on Bankruptcy* ¶ 727.03[4] (15th ed.2005) at 727–37. The section is intended "to give a creditor and the Bankruptcy Court complete and accurate information concerning the status of the debtor's affairs and to test the completeness of the disclosure requisite to the discharge." *In re Erdheim,* 197 B.R. 23, 29 (Bankr. E.D.N.Y.1996).

■■■ The plaintiffs have satisfied the requirements of section 727(a)(3) with respect to BSK's lack of records regarding his medical practice's accounts receivable. That absence of information was exacerbated by BSK's tax return's omission of any income from the collection of such accounts receivable (corrected only after discovery taken in this adversary proceeding). As noted above, it is reasonable for a doctor in BSK's position to have maintained such records; BSK bears the responsibility for their absence. Moreover, the Court does not accept BSK's testimony about their being stolen or erased.

---

**21.** 11 U.S.C. § 727(a)(3) states, "The court shall grant a debtor a discharge unless—

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case."

With respect to the second requirement of section 727(a)(3), although the Trustee believes that from BSK's bank records he can account for the money that BSK actually received after his practice ended, there was no way to verify whether there were any additional accounts receivable that remained uncollected, either for the Trustee's pursuit or otherwise to determine the state of BSK's prepetition financial affairs. (BSK testified that he did not take any steps to collect any of the accounts receivable that were owing when his practice wound down and then ceased but, rather, that he simply waited for payments to come in, and that he had no way of knowing whether other receivables remained unpaid.) More is required by section 727(a)(3) of a debtor in BSK's position and, therefore, BSK's discharge also should be denied under that section.

■■ II. *Fraudulent Transfers to Sun River and NS.* Under sections 544 (which incorporates applicable state fraudulent transfer law, in this case N.Y. D.C.L. §§ 272–276) and 548 of the Bankruptcy Code, the Trustee seeks to avoid and recover for the benefit of the estate all of the payments made by D & T to Sun River, as intentionally and constructively fraudulent.[22]

The Court has already found that BSK caused Sun River to enter into the D & T Contract with the intent to hinder, delay or defraud his creditors, or, at least MB. This permits the Trustee to avoid only the D & T Contract, however. Does it also

enable him to recover the payments made under that contract?

In large measure it does not. As discussed above, most of the money paid by D & T either would constitute exempt property under applicable non-bankruptcy law or would not be property of BSK's estate under section 541(a)(6) of the Bankruptcy Code, because, the D & T Contract having been avoided, all of the payments with the exception of the $18,000 termination payment stand revealed for what they always should have been: BSK's earnings for his personal services. All but a very small amount of such earnings, therefore, cannot be reached by the Trustee as having been fraudulently transferred by BSK. Of the few thousand dollars paid by D & T for prepetition services (which the Court found was used for the reasonable requirements of BSK and his children), 90 percent would be exempt from fraudulent transfer attack under N.Y. C.P.L.R. § 5205. *See In re Caplan's,* 196 Misc. 631, 92 N.Y.S.2d 369 (Sur.N.Y.Co.1949). The remaining 10 percent may be recovered as having been fraudulently transferred. *Id.; see also In re Portnoy,* 201 B.R. at 693. The payments by D & T for postpetition services are not recoverable as fraudulent transfers because they would not constitute property of the Debtor's estate under 11 U.S.C. § 541(a)(6). *See In re Carlson,* 263 F.3d 748, 750 (7th Cir.2001) (only prepetition portion of assigned contingency fee may be recovered as a fraudulent transfer; portion earned postpetition not avoidable); *Luker v. Reeves (In re Reeves),* 65 F.3d

---

**22.** The Trustee apparently has not persisted in seeking the recovery of any transfers made directly by BSK to NS, and, given the factual findings made above, he has not established the existence of any such avoidable fraudulent transfers, in any event. On the other hand, under 11 U.S.C. § 550(a) he could recover from NS the payments, described herein, by D & T to Sun River that constitute avoidable

fraudulent transfers. In the light of NS's knowledge of the D & T/Sun River arrangement, the Court concludes that she was either the beneficiary of such transfers (*see* 11 U.S.C. § 550(a)(1)) or the immediate or mediate transferee from Sun River and did not take in good faith for purposes of 11 U.S.C. §§ 550(a)(2) and (b)(2).

670, 673 (8th Cir.1995) (earnings attributable to debtor's personal postpetition services are not recoverable as fraudulent transfers). On the other hand, the $18,000 termination payment, which the Court has previously found was not made on account of BSK's postpetition personal services and, therefore, is property of the estate, is avoidable and recoverable as a fraudulent transfer. *Id.*

### Conclusion

For the foregoing reasons, the Debtor's discharge is denied under 11 U.S.C. §§ 727(a)(2), (a)(3) and (a)(4)(a).

In addition, the Trustee may avoid under 11 U.S.C. §§ 544 and 548 as intentional fraudulent transfers, and recover under 11 U.S.C. § 550(a) from Sun River or NS, $18,000 plus 10 percent of the money received by Sun River from D & T attributable to work performed by BSK before the start of the Debtor's chapter 7 case.

It is SO ORDERED